UNITED STATES of America, Appellant,

v.

William RILEY, Defendant–Appellee,

Norman Burnett, Jeffrey Sizemore, Vincent Mazza, Defendants.

No. 575, Docket 89–1387.

United States Court of Appeals, Second Circuit.

Argued Jan. 8, 1990.

Decided June 22, 1990.

of a storage locker that Riley had rented. Among the items suppressed were financial records, firearms, and a rental agreement for the storage locker, all seized from the residence, and three kilograms of cocaine, seized from the storage locker. The District Court held the residence warrant partially unsupported by probable cause and insufficiently particularized, and the locker warrant unsupported by probable cause and tainted as a product of the invalid residence search. We reverse.

## Background

Riley, a Vermont resident, and Vincent Mazza, a Florida resident, had been the subjects of a narcotics investigation since September 1988. Based on evidence from informants, surveillance, telephone toll records, and court-authorized wiretaps, agents of the Drug Enforcement Administration determined that Riley and Mazza had previously brought multi-kilogram quantities of cocaine into Vermont and were planning a 1,200 pound marijuana deal. In December, Riley and Mazza were arrested in a Vermont hotel room; in plain view was a large amount of money paid by Riley for the first 200 pounds of the planned marijuana shipment.

At the time of Riley's arrest, agents applied for a warrant to search his home in Underhill, Vermont. In a detailed 25–page affidavit, a DEA agent recounted the investigation of Riley and Mazza, including information that in August 1988 Mazza had sold 20 kilograms of cocaine to contacts in Vermont, including Riley, that in September and October Riley had negotiated with Mazza for an additional 30 to 50 kilograms of cocaine, and that in December Riley had received a large quantity of marijuana from Mazza. The affidavit also reported that in connection with the recent marijuana shipment, Riley received an out-of-state rental vehicle from Mazza, drove it to his home in Underhill, Vermont, and later the same night returned the vehicle, along with a cash payment, to Mazza's hotel. In addi-

Thomas D. Anderson, Asst. U.S. Atty., Burlington, Vt. (George J. Terwilliger, III, U.S. Atty., David J. Kirby, Chief, Criminal Div., Burlington, Vt., on the brief), for appellant.

Stephen Stein, Las Vegas, Nev. (David Z. Chesnoff, Las Vegas, Nev., on the brief), for defendant-appellee.

Before MESKILL and NEWMAN, Circuit Judges, and WEINSTEIN, District Judge.*

JON O. NEWMAN, Circuit Judge:

The United States appeals from the August 1, 1989, order of the District Court for the District of Vermont (Franklin S. Billings, Jr., Chief Judge), suppressing items seized pursuant to two search warrants. *See* 18 U.S.C. § 3731 (1988). The warrants, issued by a magistrate, authorized searches of the home of defendant William Riley and

---

* The Honorable Jack B. Weinstein of the District Court for the Eastern District of New York, sitting by designation.

tion to facts specific to the Riley/Mazza investigation, the affidavit also recounted the agent's unsurprising knowledge that drug traffickers often maintain records of their transactions, launder the proceeds of drug transactions, and secrete drugs, drug proceeds, drug records, and firearms at their homes and stash houses.

Based on the affidavit, the magistrate issued a warrant authorizing a search of Riley's home and the seizure of

> evidence of the offense of conspiracy to distribute controlled substances, namely cocaine, and marihuana, firearms, instrumentalities of cocaine and marihuana distribution such as scales, dilution or "cut" materials, packaging materials, telephone and/or address books and lists, telephone toll records,

and the following items, which were deemed insufficiently particularized by the District Court:

> records of the distribution of cocaine including records of distribution made and/or payments given or received, the investment of proceeds of drug trafficking in tangible or intangible objects and things, including but not limited to, bank records, brokerage house records, business records, safety deposit box keys or records and other items that constitute evidence of the offenses of conspiracy to distribute controlled substances and distribution of the same[.]

Upon executing the warrant, agents found 36 pounds of marijuana, firearms, and an agreement between Riley and a Burlington, Vermont, storage company for rental of a storage locker. The agents also found 96 pounds of marijuana in the rental car that Riley had received from Mazza. The agents then applied to the magistrate for a warrant to search the storage locker. The affidavit in support of this warrant incorporated the allegations of the first affidavit and added the discovery of the marijuana and the locker rental agreement, and information that Riley had been at the locker three weeks prior to his arrest. The magistrate issued a warrant to search the locker and to seize items described in the same language as that used in the warrant for the search of Riley's home. A search of the locker resulted in the seizure of three kilograms of cocaine.

*District Court Ruling.* With respect to the home warrant, the District Court ruled that there was no probable cause to believe that firearms were located in Riley's home. The Court also ruled that part of the language of the warrant was insufficiently particularized, especially the phrase authorizing seizure of "evidence of … the investment of proceeds of drug trafficking in tangible or intangible objects and things, including but not limited to, bank records, brokerage house records, business records[, and] safety deposit box keys and records." However, the Court found that some of the language describing items to be seized was sufficiently particularized, including the phrase "other items that constitute evidence of the offenses of conspiracy to distribute controlled substances and distribution of the same." Concluding that the defects in the warrant should have been apparent to a reasonably well-trained agent, the Court ruled that the good-faith exception to the exclusionary rule for seizures pursuant to warrants was unavailable, *see United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and suppressed the firearms and the storage locker rental agreement.

With respect to the storage locker warrant, the Court ruled that seizure of the rental agreement was not called for by any valid portion of the home warrant, that the storage locker warrant was therefore the fruit of the partially invalid search of the home, that, even with the rental agreement, there was no probable cause to believe that drugs were located in the storage locker, and that the good-faith exception of *Leon* was inapplicable to this search as well. The Court therefore suppressed the cocaine found in the locker.

On appeal, the Government does not seek review of the conclusion that probable cause to search the home for firearms was lacking, but defends seizure of the firearms from the home on the basis of the *Leon* good-faith exception and on the further ground that the firearms were in plain

view. To support seizure of the cocaine from the storage locker, the Government contends that the rental agreement was in plain view, that the "records" language of the home warrant was sufficiently particularized, that there was probable cause to believe that cocaine was in the storage locker, and that the *Leon* good-faith exception is applicable.

### Discussion

We consider first the particularity issue, to which the parties have devoted primary attention. As the District Court noted, the particularity requirement guards against general searches that leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized. *See Andresen v. Maryland*, 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976); *Marron v. United States*, 275 U.S. 192, 195–96, 48 S.Ct. 74, 75–76, 72 L.Ed. 231 (1927).

In considering the District Court's application of this requirement to the language of the warrant to search Riley's home, we encounter two puzzling aspects of the Court's opinion. First, the Court appears to have misread one portion of the warrant. Focusing on the phrase authorizing seizure of "records of ... the investment of proceeds of drug trafficking in tangible or intangible objects and things,"[1] the Court concluded that this phrase left the officers free to search through all of Riley's papers "trying to determine—without any guidance—whether or not any particular paper constitutes 'tangible or intangible' evidence of the investment of drug proceeds." Whatever the uncertainty confronting the officers, a matter we consider below, it did not concern determining whether a piece of paper constitutes tangible or intangible evidence of invested drug proceeds. The warrant did not call for seizure of tangible or intangible *evidence* of investments; the phrase "tangible or intangible" described the objects or things in which the drug proceeds were invested.

Second, the Court's view that the language describing investment proceeds records was too broad appears unrelated to its conclusion that the storage locker rental agreement was improperly seized. This agreement was within a category of items that the Court ruled was sufficiently described in the warrant—namely, "items that constitute evidence of the offenses of conspiracy to distribute controlled substances." With respect to a person who has negotiated for the acquisition of, and accepted delivery of large quantities of narcotics, a rental agreement for a storage locker in a nearby town is evidence of a conspiracy to distribute drugs.

■ In any event, we disagree with the District Court that the warrant's description of the category of records that could be seized was insufficiently particularized. In upholding broadly worded categories of items available for seizure, we have noted that the language of a warrant is to be construed in light of an illustrative list of seizable items. *See United States v. Young*, 745 F.2d 733, 759–60 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); *see also Andresen v. Maryland*, 427 U.S. at 480–81, 96 S.Ct. at 2748–49. In the pending case, the warrant supplied sufficient examples of the type of records that could be seized—bank records, business records, and safety deposit box records. No doubt the description, even with illustrations, did not eliminate all discretion of the officers executing the warrant, as might have occurred, for

---

1. The District Judge quoted this excerpt as *"evidence of ... the investment of proceeds [etc.]"* (emphasis added). We think it clear that the warrant was more precise in its description of things to be seized than is suggested by the way the Court quoted the excerpt. The warrant begins its description of things to be seized with the phrase "evidence of the offense of conspiracy to distribute controlled substances, namely" and follows this general phrase with several categories of items; one of those categories is "records of the distribution of cocaine including records of ... the investment of proceeds of drug trafficking in tangible or intangible objects and things...." Thus, the warrant did not merely authorize seizure of "evidence of ... the investment of proceeds" but more precisely illustrated such evidence by identifying the category of "records of ... the investment of proceeds." Clearer understanding of the proper parsing of the affidavit would have been aided by more helpful punctuation.

example, if the warrant authorized seizure of the records of defendant's account at a named bank. But the particularity requirement is not so exacting. Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category.

It is true that a warrant authorizing seizure of records of criminal activity permits officers to examine many papers in a suspect's possession to determine if they are within the described category. But allowing some latitude in this regard simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked "drug records."

■ Valid seizure of the storage locker rental agreement and over 100 pounds of marijuana found in Riley's house and car provided probable cause for the Government to obtain a warrant to search the locker. The fact that the period covered by the rental agreement had ended seven months prior to the search of the locker did not undermine probable cause. One of the agents contacted the storage company and determined that Riley was still renting that particular locker and had been seen using it as recently as November 30, 1988. Armed with these facts and knowing from experience that dealers use such lockers to store drugs pending distribution, the agents would have been remiss in their duties had they not sought a warrant to search the storage locker. The agents were under no obligation to establish that Riley had used the locker during the pendency of the marijuana transaction that resulted in his arrest. *See United States v. Cruz*, 785 F.2d 399 (2d Cir.1986). The cocaine found in the locker was validly seized.

Our dissenting colleague, fearing we have approved a general search, conducts a general review of Fourth Amendment law and reaches the extravagant conclusion that our ruling would justify an examination of every piece of paper in a suspect's

home, including diaries and love letters, and scientific examination of every physical item in the home. The breadth of Judge Weinstein's alarms is exceeded only by their distance from the holding in this case. The warrant authorized the agents to search for records of the distribution of cocaine and records of the investment of drug proceeds and illustrated permissible types of the latter records by listing bank records, business records, and safety deposit records, in other words, records that could reasonably be expected to indicate what the defendant had done with drug proceeds or the locations where he maintained such proceeds or items obtained by use of such proceeds. A storage locker is surely a location where drugs held for distribution or items purchased with drug proceeds might reasonably be stored, and a rental agreement for such a locker is surely a business record of such distribution or storage. It is neither a diary nor a love letter. Nor is there any claim in this case that agents read diaries or love letters in the search that discovered the storage locker rental agreement.

Having found the rental agreement, the agents did not proceed lawlessly to search the locker; they presented their evidence to a magistrate who justifiably found probable cause to believe that a search of the locker would uncover evidence of drug trafficking. In executing the second warrant, the agents found cocaine and lawfully seized it. The two warrants were valid, as were the actions of the agents in executing them. The Fourth Amendment is not well served by misreading a narrow ruling as if it gave law enforcement officials a broad license to conduct general searches. Law enforcement officials would be well advised to take their guidance from what the majority has ruled in the particular circumstances of this case, not from what the dissent apprehends would be the state of the law if a far broader ruling had been made.

■ With respect to the firearms seized at Riley's home, the District Court read our decision in *United States v. $10,000 in United States Currency*, 780 F.2d 213 (2d

Cir.1986), as a holding that a warrant to search for firearms is not justified by officers' general knowledge that drug traffickers often have weapons. We do not read that opinion so strongly. Though it discounts the significance of agents' knowledge concerning drug traffickers' possession of weapons as a basis to search for such weapons, 780 F.2d at 218, it is not a holding on that point. The holding had nothing to do with a seizure of firearms; our holding was that a seizure of currency and gold bars was valid because the items were in plain view during the execution of a valid search warrant authorizing seizure of narcotics.

In the pending case, we need not decide whether the observation in *$10,000* concerning firearms should become a holding because we are satisfied that the seizure of the firearms from Riley's home was valid under the good-faith exception of *Leon.* Whether or not the firearms were in plain view, as the Government contends (a matter on which the record is inconclusive), the officers were in good faith in seizing the weapons in the execution of a warrant that explicitly authorized the seizure of "firearms." If the inclusion of "firearms" in the list of seizable items was error at all, it surely was not an error of which a reasonable police officer should have been aware.

The order of the District Court is reversed.

WEINSTEIN, District Judge, dissenting.

The majority opinion constitutes one small step forward in the current war on drugs and one giant leap backward in the centuries-old struggle against general search warrants. As indicated in Parts II and III below, the decision dangerously dilutes our tradition against general warrants. Part IV suggests that this reduction of legal protection in combination with current scientific developments in investigative techniques compounds the danger to our civil rights.

All members of this appeals panel and the trial judge agree that there was sufficient evidence that defendant used his home in marijuana transactions to support a search warrant for that drug. In fact, upon searching the home approximately 40 pounds of marijuana were found. This material, together with other evidence, warranted conviction for a violation of the drug control laws. The available penalties would have included many years in prison and heavy fines. *See* 21 U.S.C. §§ 841(b)(1)(D) & 963 (10 years, $500,000.00 fine).

The trial judge and I disagree with the majority of the panel on whether the search warrant was written so broadly and executed so liberally as to constitute in effect a general search warrant. If it was, then the seizure of documents that led to the discovery of cocaine in a commercial storage locker would have been improper, and the evidence that resulted from the seizure should have been properly suppressed.

I

FACTS

The warrant in question was issued by the magistrate to search defendant's residence for "items that constitute evidence of conspiracy" or of drug offenses. This general phrase was added to a long list of particular items and types of documents. Authorized to be seized were:

> evidence of the offense of conspiracy to distribute controlled substances, namely cocaine, and marihuana, firearms, instrumentalities of cocaine and marihuana distribution such as scales, dilution or "cut" materials, packaging materials, telephone and/or address books and lists, telephone toll records, records of the distribution of cocaine including records of distribution made and/or payments given or received, the investment of proceeds of drug trafficking in tangible or intangible objects and things, including but not limited to, bank records, brokerage house records, business records, safety deposit box keys or records and other *items that constitute evidence of the offenses of*

847

*conspiracy to distribute controlled substances and distribution of the same.* (Emphasis added).

The warrant was executed on December 21, 1988. Among the items seized were guns and:

 2 [Bales] of marijuana
 3 tin [foils] of marijuana

 . . . . . .

 2 baggies of marijuana
 1 box of M80's
 Misc. financial records
 1 address book

 . . . . .

 1 box electronic gear

Included in the "financial records" was an expired rental agreement for a commercial storage locker located in another town 10 miles away. It is not disputed that without this seizure the government would have been unaware of the locker lease.

An agent contacted the storage company and was informed that defendant was still renting the storage locker, that he was last known to have visited it on November 30, 1988, but that he could have had access after that time without record having been made. On December 23, 1988, based upon the rental agreement seized in execution of the first warrant, a second warrant was issued to search the storage locker. That warrant was executed the same day and a quantity of cocaine was seized from within the storage locker.

The majority maintains that seizure was justified under the portion of the warrant listing "other items that constitute evidence of the offenses of conspiracy to distribute controlled substances." This type of vague boilerplate language so construed creates grave dangers to personal liberty. As interpreted by the majority and demonstrated in Parts III and IV infra, it gives police officers carte blanche to search every nook and cranny of a home from basement to attic; to examine every item, including clothing, linens and the like, to open and rifle every closet, cabinet, drawer, briefcase and piece of luggage; to remove bedding, carpets, floors and walls; to seize garbage and the residue in plumbing drains; and to read every book and piece of paper.

## II

## THE LAW'S ABHORRENCE OF GENERAL SEARCH WARRANTS

The drafters of the Fourth Amendment, as well as those who preceded and succeeded them in the struggle to protect our homes against untrammeled invasion by the police, would have characterized this action now approved as an unconstitutional general warrant and search. The Fourth Amendment explicitly spells out the "right of the people to be secure in their ... houses, papers and effects" and the need for warrants "particularly describing ... the place to be searched, and ... things to be seized." It reads:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing the place to be searched, and the persons or things to be seized.*

(Emphasis added).

The Fourth Amendment stands as a milestone in the struggle against government's intrusion into our homes. From the beginning of our Constitution a shining principal has been closely adhered to: a warrant must be narrowly drawn and restrictively enforced, particularly where it involves a search of the home. One's abode, even if humble, has always been considered by Americans as an inviolate castle and keep, safe against intrusions by the state except under the strictest of limits.

Three landmark cases in England brought an end to the issuance of general warrants there. In *Entick v. Carrington,* 19 Howell's State Trials 1029 (1765), the plaintiff prosecuted an action for trespass after defendants forcibly entered his house, searched his private papers, and seized numerous documents thought to be evidence

of the crime of seditious libel. The plaintiff's attorney argued, "What? Has a secretary of state a right to see all a man's private letters of correspondence, family concerns, trade and business? This would be monstrous indeed! and if it were lawful, no man could endure to live in this country." *Id.* at 1038. Lord Camden, in delivering the judgment, agreed:

> Papers are the owner's goods and chattels: they are his dearest property; and are so far from enduring a seizure, that they will hardly bear an inspection.... Where is the written law that gives any magistrate such a power? I can safely answer, there is none; and therefore it is too much for us without such authority to pronounce a practice legal, which would be subversive of all the comforts of society.

*Id.* at 1066. In considering the effect of this ancient case on present law we should recall that the conduct complained of in *Entick* included entering plaintiff's house and

> continuing there for four hours, and all that time disturbing the plaintiff in the possession thereof, and searching several rooms therein, and one bureau, one writing desk, and several drawers of the plaintiff in his house, and reading over and examining several of his papers there, and seizing, taking and carrying away some of his books and papers there found.

*Id.* at 1036. How much more thorough and disruptive are the sovereign's agents in the modern day.

In the *Case of John Wilkes,* 19 Howell's State Trials 1075 (1763–70), a publisher was convicted of seditious libel after copies of the *North Briton,* No. 45, were seized from his home. In a later proceeding Wilkes obtained verdicts against those who issued and executed the warrant. *Wilkes v. Wood,* 19 Howell's State Trials 1154 (1763).

Another case for damages brought by one of Wilke's co-defendants resulted in strong disapproval of the practice by Chief Judge Pratt:

> "To enter a man's house by virtue of a nameless warrant in order to procure evidence is worse than the Spanish inquisition, a law under which no Englishman would wish to live an hour: it was a most daring public attack made upon the liberty of the subject."

*Leach v. Money,* 19 Howell's State Trials 1405, *aff'd,* 19 Howell's State Trials 1002 (1765). In 1766, as a result of these cases, the House of Commons condemned general warrants. T. Cooley, *A Treatise on the Constitutional Limitations* 612–15 & n. 1 (8th ed.1927).

The English abhorrence of general warrants and respect for the sanctity of the home was transplanted to colonial America, which had its own problems with overreaching by the Crown. *See generally,* D. Flaherty, *Privacy in Colonial New England* 85–88 (1972). In 1761 general warrants were addressed in a Massachusetts case, reported by John Adams. *See No. 44. Petition of Lechmere* in 2 J. Adams, *Legal Papers* 106 (1965) (commonly known as the Argument on Writs of Assistance). The argument of James Otis against the granting of the writs, although unsuccessful, helped to solidify colonial opposition to the general warrant. *Id.* at 116–7. Otis declared:

> Now one of the most essential branches of English liberty, is the freedom of one's house. A man's house is his castle; and while he is quiet, he is as well guarded as a prince in his castle. This writ, if it should be declared legal, would totally annihilate this privilege. Custom house officers may enter our houses when they please—we are commanded to permit their entry—their menial servants may enter—may break locks, bars and every thing in their way....
>
> ....
>
> It is the business of this court to demolish this monster of oppression, and to tear into rags this remnant of Starchamber tyranny.

*Id.* at 142–144.

Our country and our courts have always nurtured this tradition that general warrants violate fundamental rights. "Implicit

in the Fourth Amendment's protection from unreasonable searches and seizures is its recognition of individual freedom." *Ker v. California,* 374 U.S. 23, 32, 83 S.Ct. 1623, 1629, 10 L.Ed.2d 726 (1963). Violation of individual rights, in particular the right to be left alone in the privacy of the home, is the wrong to be prevented by the warrant clause. "It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property." *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886). The Fourth Amendment is concerned with the individual's right to privacy, and the security of his property, and not with the reliability of evidence. *Jones v. United States,* 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960).

Protection of these rights is insured by requiring that, in reviewing an application for a warrant, "inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). In addition, generality is forbidden both as to place and items to be seized. *See, e.g., Marron v. United States,* 275 U.S. 192, 195–96, 48 S.Ct. 74, 75–76, 72 L.Ed. 231 (1927).

Protection of the Fourth Amendment is strongest in those situations where the harm from intrusion is potentially greatest. In particular, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court, E.D. Mich., S. Div.,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972).

More than one hundred years ago, the Supreme Court warned that the search of private papers is of particular concern; "The search for and seizure of stolen or forfeited goods ... are totally different things from a search for and seizure of a man's private books and papers." *Boyd v. United States,* 116 U.S. 616, 623, 6 S.Ct.

524, 528, 29 L.Ed. 746 (1886). Now, having heeded that warning through five major wars, we are forgetting it in the battle against drugs.

Protection of the Fourth Amendment "extends to offenders as well as to the law abiding." *United States v. Lefkowitz,* 285 U.S. 452, 464, 52 S.Ct. 420, 423, 76 L.Ed. 877 (1932). "The Amendment is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted." *Go–Bart Importing Co. v. United States* 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed. 374 (1931).

The Supreme Court has repeatedly instructed us that the protection of the Fourth Amendment must not be narrowed in order to provide more effective law enforcement.

> It would not be possible to add to the emphasis with which the framers of our Constitution and this court have declared the importance to political liberty and to the welfare of our country of the due observance of the rights guaranteed under the Constitution by [the Fourth Amendment].... [S]uch rights are declared to be indispensable to the "full enjoyment of personal security, personal liberty and private property"; ... they are to be regarded as of the very essence of constitutional liberty.... [The] amendment should receive a liberal construction, so as to prevent stealthy encroachment upon or "gradual depreciation" of the rights secured by [it], by imperceptible practice of courts or by well-intentioned, but mistakenly overzealous, executive officers.

*Gouled v. United States,* 255 U.S. 298, 303–304, 41 S.Ct. 261, 263, 65 L.Ed. 647 (1921) (citations omitted).

> [T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment. The investigation of crime would always be simplified if warrants were unnecessary. But the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the

privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law.

*Mincey v. Arizona,* 437 U.S. 385, 393, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290 (1978) (citations omitted).

The war on drugs is today the excuse for a perceptible narrowing of the warrant clause. We are gradually creating what one author has termed the "drug exception to the Fourth Amendment." Wisotsky, *Crackdown: The Emerging "Drug Exception" to the Bill of Rights,* 38 Hastings L.J. 899, 910 (1987).

We ignore at our peril Justice Marshall's warning:

Precisely because the need for action against the drug scourge is manifest, the need for vigilance against unconstitutional excess is great. History teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure.

*Skinner v. Railway Labor Executives' Association,* 489 U.S. 602, 109 S.Ct. 1402, 1422, 109 S.Ct. 1402 (1989) (Marshall, J., dissenting).

A warrant will often necessarily be hastily approved by a judicial officer. It will be executed subject to the "reasonable" interpretations of law enforcement personnel whose primary motivation is to obtain evidence to prosecute rather than to protect against intrusions of privacy. The police officer at the scene can be expected to push the search to the outer limits permitted by the warrant rather than to restrict it on the grounds of privacy, circumspection and the right of each of us to close our door and live without intrusion from the government.

Here there is little question that the language of the search warrant and its execution far exceeded what any construction—strict or liberal—of the Fourth Amendment read in its historical light could have condoned. In effect, it permits a search for evidence of crimes and for material which might lead to evidence of crimes. It embodies a standard as loose as that for discovery under Rule 26 of the Rules of Civil Procedure, which itself has been heavily criticized as not restrictive enough even in civil cases.

## III

## THE LAW LIMITING SEARCH WARRANTS

A general clause in a search warrant, such as the one the majority cites as authority for the seizure in question, must be narrowly interpreted in light of the specific clauses that precede it. *Andresen v. Maryland,* 427 U.S. 463, 480–82, 96 S.Ct. 2737, 2748–49, 49 L.Ed.2d 627 (1976); *United States v. Young,* 745 F.2d 733, 759–60 (2d Cir.1984), *cert. denied sub nom. Myers v. United States* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); *United States v. Bithoney,* 631 F.2d 1, 2 n. 1 (1st Cir. 1980), *cert. denied,* 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981). "A warrant must be read as a whole." *United States v. Johnson,* 690 F.2d 60, 64 (3rd Cir.1982), *cert. denied,* 459 U.S. 1214, 103 S.Ct. 1212, 75 L.Ed.2d 450 (1983). The Fourth Amendment cannot be interpreted as giving authority to seize types of objects other than those revealed by evidence prior to the issuance of the warrant.

In this case, since there is no indication in the warrant or its supporting affidavit that the magistrate considered whether the agents should seize a document such as the storage locker rental agreement, they had no authorization to do so. This is not a case where the nature of the crime militated against describing the items to be seized with specificity. *See United States v. Buck,* 813 F.2d 588, 590 (2d Cir.1987) (in case of murder during armed bank robbery, warrant overbroad but officers acted in good faith in seizing false mustache, make-up kit and bomb-making equipment). *See also Andresen v. Maryland,* 427 U.S. 463, 480 n. 10, 96 S.Ct. 2737, 2748 n. 10, 49 L.Ed.2d 627 (1976) (upholding vague warrant as necessitated by the nature of the crime (fraud) and the evidence).

Breaches there have been in the barrier against general warrants. *See, e.g., United States v. Young,* 745 F.2d 733, 759 (2d

Cir.1984) (term "money" in warrant held to be sufficiently limiting to permit seizure of furs, jewelry and expensive car as "other evidence"). But those tears in the fabric of the Fourth Amendment should be repaired, not extended further.

Had there been probable cause to believe that defendant controlled other apartments, houses or storage spaces that were used in his narcotics activity, the warrant might have specifically authorized the search for evidence of those locations. *See United States v. Gomez–Soto*, 723 F.2d 649, 654 (9th Cir.) ("Since the DEA sought articles it claims are typically found in the possession of narcotics traffickers, the warrant could have named or described those particular articles." Because "the government could have drafted a warrant to get what it wanted without authorizing an exploratory general search," the overbroad warrant was invalid.), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984). Without such specificity, evidence cannot be seized. *See United States v. Fuccillo*, 808 F.2d 173, 176–77 (1st Cir. 1987) (warrant that could have been more specific, but was not, was unconstitutional); *United States v. Cardwell*, 680 F.2d 75, 78 (9th Cir.1982) (generic descriptions in warrant invalid, particularly where results of investigation could have been used to pare down warrant; evidence suppressed).

Nor is this a case where the agents used other language in the warrant to narrow the catch-all provision. *See United States v. Young*, 745 F.2d 733, 759 (2d Cir.1984) ("money" in prior clause of warrant used to limit what constitutes "other evidence"). The rental agreement was completely outside the class of items named with specificity in the warrant. The majority claims that "the warrant supplied sufficient examples of the type of records that could be seized—bank records, business records, and safety deposit box records." The warrant, however, lists these records as a subset of "records of the investment of proceeds of drug trafficking." A storage locker rental agreement cannot be reasonably analogized to a record of the investment of proceeds of drug trafficking. This language, while in words limiting the discre-

tion of the agent to act pursuant to the catch-all language, in fact provides no effective constraint.

The rental agreement by itself cannot be considered evidence of the crime charged in the warrant. It is not contraband or illegal on its face. *See United States v. Morisse*, 660 F.2d 132, 136 n. 1 (5th Cir.1981) (if item to be seized cannot be facially determined to be illegal, warrant must inform law enforcement agent how to distinguish it from legal item). The agreement had expired several months before its seizure. At most, it was material that might lead to evidence of some crime.

Using similar reasoning, this kind of catch-all warrant would give the police the right to search every diary and letter in the house, for these papers might contain a reference to other persons possibly involved in drug activities (as co-conspirators or customers), or to proceeds or investments of proceeds of drug activities, or to locations of crimes.

A personal address book could be seized, and all those listed contacted and interviewed to see if they had any connection to drug activity. The same is true of any correspondence; a sonnet sent by a lover would be no less immune than a registered letter from someone in an area which is a drug source.

All bank records, financial statements, bills or lists of purchases and other jottings could furnish evidence of illicit income or expenditures, or where money came from, or when it might be subject to seizure. Laundry lists would be fair game, for what trial judge has not heard drug enforcement experts explain that "three shirts" means three kilograms of cocaine in the argot of the drug world. *See, e.g., People v. Williams*, 6 N.Y.2d 18, 187 N.Y.S.2d 750, 159 N.E.2d 549 (1959) (defendant used talk about laundry as code for drug transactions). Books might contain markings or notes or might indicate the cast of defendant's mind as a likely drug conspirator, or might show handling by a possible co-conspirator linked to the defendant. *See, e.g., Richardson v. Johnson* 864 F.2d 1536 (11th

Cir.1989) (book entitled "Explosives and Bomb Disposal Guide" used as evidence against defendant in bombing case); *United States v. Giese,* 597 F.2d 1170 (9th Cir.) (fingerprints of several individuals on book owned by defendant used as evidence of conspiracy), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979).

In short, there is nothing to prevent the seizure of every piece of paper in the house. Such police practices have been condoned in the Soviet Union, *see, e.g.,* N. Sharansky, *Fear No Evil* 9 (1988), but they have never been allowed under our Constitution. *See, e.g., Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965) (warrant authorizing seizure of any written material relating to Communist Party, resulting in seizure of 300 books and pamphlets, homeowner's marriage certificate, insurance policies and other personal papers, held defective as a general warrant). *See also Andresen v. Maryland,* 427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 2749 n. 11, 49 L.Ed.2d 627 (1976) (searches and seizures of documents involve greater dangers to privacy than searches for other objects); *Boyd v. United States,* 116 U.S. 616, 623, 6 S.Ct. 524, 528, 29 L.Ed. 746 (1886) (same).

In effect, this type of warrant as interpreted by the majority becomes the equivalent of no warrant at all, with all the dangers of overreaching inherent in warrantless searches. See, for example, *Kremen v. United States,* 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876 (1957), where a warrantless search on suspicion that the cabin owner was harboring a fugitive resulted in the seizure of every item in the cabin, from a sponge to a clove of garlic, and required ten pages of the United States Reports to set out the inventory. *See also United States v. United States Dist.Ct.E.D.Mich. S.Div.,* 407 U.S. 297, 324–33, 92 S.Ct. 2125, 2140–45, 32 L.Ed.2d 752 (1972) (noting dangers of warrantless searches, and citing *Kremen* ) (Douglas, J., concurring).

Nor, as the government argued, can the warrant and search approved today be saved by the good faith exception, *see United States v. Leon,* 468 U.S. 897, 916, 104 S.Ct. 3405, 3417, 82 L.Ed.2d 677 (1984) or the plain view doctrine, *see Horton v. California,* — U.S. —, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Under the government's interpretation of those doctrines, the officers' reliance on the broad warrant and their search of all of defendant's papers was arguably under a good faith belief that the warrant was proper and that they were authorized to make such a sweeping search. But the storage rental agreement is on its face not a record of investment of the proceeds of narcotics trafficking, and no one in good faith could believe it to be so. Hence the good faith exception by itself does not excuse seizure.

The government also urges that the agreement was discovered during the search for investment records, legally conducted pursuant to a proper warrant, or at least pursuant to a good faith belief in the warrant's propriety. Since, it is contended, the discovered item was facially incriminatory, it could be seized under the plain view doctrine.

Such an analysis relying on good faith and plain view completely eviscerates any protection against general warrants. It would allow officers to enter a person's home with an invalid warrant, albeit one that they believed in good faith to be valid. They could then search anywhere in the home for anything listed in that invalid warrant, and anything else they found during the course of that search could be seized as being in "plain view." This is precisely the kind of rummaging exploratory search forbidden by the Fourth Amendment. To seize an object under "plain view," its "incriminating character must ... be 'immediately apparent.'" *Horton v. California,* — U.S. —, —, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990) (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 466–69, 91 S.Ct. 2022, 2038–40, 29 L.Ed.2d 564 (1971)). An expired storage locker rental agreement cannot be considered facially incriminatory; its "incriminatory character" is not "immediately apparent."

There was no probable cause to believe that such a document was evidence of a crime. *See Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 1152–53, 94 L.Ed.2d 347 (1987) (probable cause required to seize item in plain view; no probable cause to seize expensive stereo equipment as being out of place in squalid apartment). This interpretation of plain view would only encourage vague, scanty warrants, since it would be easier and legally more successful to seize items under plain view than to do the investigative work beforehand to establish probable cause that specific incriminatory items were actually present. As the majority opinion demonstrates, probable cause is more easily "established" in hindsight.

## IV

### NEW FORENSIC SCIENCE TECHNIQUES

The increasing sensitivity and sophistication of forensic science means that almost any object in a person's house could provide evidence of drug activity and be the subject of seizure under the warrant and search procedures allowed by the majority. Because of these scientific advances, it has become even more necessary than heretofore to forcefully uphold the Fourth Amendment's protections against general searches and seizures.

We must take judicial notice of forensic developments if we are to fully understand the effect of the new policy adopted by the majority. In evaluating such proposed departures from prior law, the court is not bound by the limits of Rule 201 of the Federal Rules of Evidence. *Fed.R.Evid. 201* advisory committee's note (rule does not apply to legislative facts, those that have relevance to legal reasoning and the law making process, and court is free to utilize such facts). *See also Bulova Watch Co. v. K. Hattori & Co.,* 508 F.Supp. 1322, 1328 (E.D.N.Y.1981).

Under the warrant in this case as interpreted by the majority, all cash would be subject to seizure since bills would have to be examined for markings or contact with drugs. Kitchen utensils might have residues if used in the mixing of drugs. Baggies, saran wrap and garbage bags might be used in the packaging and transportation of drugs. Any table or desk and the floor under it might contain a trace of drugs spilled if the surface was used for cutting, weighing or packaging. If cocaine was free-based or marijuana or other drugs smoked, there might be residue on the walls. All of these items could be seized and brought to the laboratory for analysis since present techniques allow the detection of minute traces of drugs invisible to the naked eye and undetectable by the most sensitive olfactory organs of man or dog. *See, e.g.,* Nielson & Katz, *A Processing Protocol for Drug Residue and Latent Print Evidence,* 33 J. Forensic Sci. 1463 (1988) (describing method of detecting cocaine residue and latent fingerprints on a variety of surfaces); Cone & Mitchell, *Validity Testing of Commercial Urine Cocaine Metabolite Assays: II. Sensitivity, Specificity, Accuracy and Confirmation by Gas Chromatography/Mass Spectrometry,* 34 J. Forensic Sci. 32, 36 (1989) (commercial testers could detect and measure $5.0 \times 10^{-8}$ g/ml of cocaine metabolite in urine); Smith & Joseph, *EMIT Assays for Drugs of Abuse,* in *Analytical Aspects of Drug Testing* (1989) 35, 48 (immunoassay technique detects THC in concentrations of $10^{-9}$ g/ml). *See also, e.g.,* Voyksner, *High Performance Liquid Chromatography/Mass Spectrometry,* in *Analytical Aspects of Drug Testing* (1989) (describing technique able to detect $10^{-12}$ g of organics).

Furniture, carpeting and parts of the walls could also be removed, both to detect drug residues, and in an effort to prove that drugs seized elsewhere were once stored in the house, by linking the residues to the drugs seized, *see, e.g., United States v. Kelly,* 420 F.2d 26 (2nd Cir.1969) (technique of neutron activation analysis, used to link drugs found in two different locations, is sufficiently reliable), or by linking minute particles of foreign objects such as fibers or paint chips found on drugs to objects in the house. *See, e.g., Williams v. State,* 251 Ga. 749, 312 S.E.2d 40 (1983)

(allowing expert evidence linking fibers in defendant's home to fibers found on homicide victims); *People v. Mackins*, 17 Ill. App.3d 24, 308 N.E.2d 92 (1st Dist., 1st Div.1974) (allowing expert evidence of laser emission spectroscopy to identify paint fragments, linking defendant's car to crime scene).

The sheets on the bed could be taken to the laboratory because hair, blood, semen or saliva stains found there could be analyzed to show use of narcotics. *See generally* Markey & Henderson, *Hair Analysis for Drugs of Abuse* in 2 Advances in Analytical Toxicology 298 (1985); Graham, Koren, Klein, Schneiderman & Greenwald, *Determination of Gestational Cocaine Exposure by Hair Analysis*, 262 J.Amer. Med.Ass'n 3328 (1989); Smith, *Detection of Amphetamine in Bloodstains, Semen, Seminal Stains, Saliva, and Saliva Stains*, 17 Forensic Sci. 225 (1981). *See also Burgel v. Burgel*, 141 A.D.2d 215, 533 N.Y.S.2d 735 (2d Dep't 1988) (compelling discovery request for mother to submit to hair test in child custody case, but not deciding issue of admissibility). Razors in the bathroom, tops of vanities, portions of the floor and residue of drains might also lead to hair or other organic material that could evidence drug use.

Residues of blood and semen (and possibly hair and saliva) could be subjected to DNA analysis that might show the presence and identities of people other than the defendant. In this way, other people might be implicated in a conspiracy by their connection with the defendant, or, if these other people were known to law enforcement officials as drug users or dealers, the defendant might be further compromised. Growing data banks will ultimately permit DNA evidence to be used like a giant fingerprint file in connecting one defendant to others suspected of involvement in similar crimes. *See generally DNA: Report of New York State Forensic DNA Analysis Panel* (Sept. 6, 1989); Thornton, *DNA Profiling*, Chemistry and Engineering, November 20, 1989, at 18; Thompson & Ford, *DNA Typing: Acceptance and Weight of The New Genetic Identification Tests*, 75 Va.L.Rev. 45 (1989). *See also, e.g., State v.*

*Schwartz*, 447 N.W.2d 422 (Minn.Sup.Ct. 1989) (en banc) (allowing DNA evidence); *Andrews v. State*, 533 So.2d 841 (Fla.Dist. Ct.App.1988) (same); *People v. Castro*, 144 Misc.2d 956, 545 N.Y.S.2d 985 (Sup.Ct.1989) (not allowing DNA evidence, but only because of deficiency in laboratory technique used).

The house could be swept for fingernail clippings, since their uniqueness could be used as evidence of the presence of a particular individual. *See State v. Shaw*, 124 Wis.2d 363, 369 N.W.2d 772 (Ct.App.1985) (allowing such evidence); *Admissibility of Evidence of Fingernail Comparisons in Criminal Cases*, 40 A.L.R. 4th 575 (1989) (citing cases). *See also* Diaz, Boehm & Rowe, *Comparison of Fingernail Ridge Patterns of Monozygotic Twins*, 35 J. Forensic Sci. 97 (1990) (demonstrating uniqueness of ridge patterns even in identical twins).

Any object in the house could be seized as possibly containing fingerprints identifying the presence of specific people. *See, e.g., United States v. Giese*, 597 F.2d 1170, 1184–85 (9th Cir.) (fingerprints of several individuals on a book owned by defendant used as evidence of conspiracy), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). Modern fluorescence techniques, using new reagents and illumination by laser light, permit the examination of latent fingerprints on almost any surface, from paper or plastic to human skin. *See* Menzel & Mitchell, *Intramolecular Energy Transfer in the Europium–Ruhemann's Purple Complex: Application to Latent Fingerprint Detection*, 35 J. Forensic Sci. 35 (1990) (describing new technique of laser examination of fingerprints on porous surfaces such as paper and wood); Kent, *Latent Fingerprints and Their Detection*, 21 J. Forensic Sci. Soc'y 15 (1980). *See, e.g., People v. Eyler*, 133 Ill.2d 173, 139 Ill.Dec. 756, 549 N.E.2d 268 (1989) (admitting fingerprint evidence produced by cyanoacrylate esters ("superglue") method).

Cosmetics or any object with traces of cosmetics could be seized and analyzed in order to link the cosmetics to that pos-

sessed or worn by a particular person, thus demonstrating that person's presence in the house. *See* Keagy, *Examinations of Cosmetic Smudges Including Transesterification and Gas Chromatographic/Mass Spectrometric Analysis*, 28 J. Forensic Sci. 623 (1983) (describing method for determining common source of traces of cosmetics).

Such developments may sound like science fiction, but they are becoming standard forensic techniques. The appeal of scientific theory and technology is so great that once these methods are developed they are almost certain to be used. As an example, we need only remind ourselves of the development of airport security systems. They were at first limited to use on people who fit a certain profile suggesting an increased potential for criminal activity. *See United States v. Lopez*, 328 F.Supp. 1077 (E.D.N.Y.1971). Once effective screening equipment was developed, however, every passenger was stopped and electronically searched. A similar expansion is currently occurring in the area of employee drug testing. *See National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 1398–1402, 103 L.Ed.2d 685 (1989) (Scalia, J., dissenting) (criticizing drug testing of Customs Service employees as unconstitutional invasion of privacy not based on any plausible protection of public safety, in contrast to testing of railway employees approved in *Skinner v. Railway Labor Executives' Association,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)).

## V

### CONCLUSION

We are seeing a fateful confluence of decreased concern for private constitutional rights, increased pressure on law enforcement officials in a war on drugs, and sharp advances in forensic science. Sensitivity to the dangers to civil rights is required. It is a paradox that as the Eastern Europeans are escaping from the horrors of dictatorships that ignored civil rights and are expressing enormous esteem and respect for our legal protections, these protections are increasingly being denigrated in our country.

These developments do not threaten imminent danger of widespread police intrusions into the home. First, there are at the moment insufficient personnel, laboratories and funds to support such a wide expansion of police activity. Second, the tradition and good sense of the legal establishment in this country militates against abuse by law enforcement personnel. Third, a free press would ultimately reveal overreaching that would, it is hoped, revolt our citizenry.

Nevertheless, the power now afforded permits the government and the police to target individuals, particularly those who are pariahs of the moment, and to ignore their traditional rights in the home. As in the past, the law should stand firm to protect even those the majority deems unworthy. Reduce the rights of these few, and we threaten the rights of all. *E.g. United States v. Patrick*, 899 F.2d 169, 172 (2d Cir.1990) (Weinstein, J., dissenting).

The way to protect against potentially limitless searches and seizures is to follow the words of the Fourth Amendment. A warrant must be narrowly drawn. The items specified must be keyed to detailed and specific information contained in an affidavit presented to the magistrate that is the product of good investigative work. Vague general language, or exhaustive lists of everything in a house that might conceivably be of assistance to investigators must not be tolerated.

I dissent.