**UNITED STATES of America**

v.

**Richard S. MARKEY and Joseph W. Simpson aka "Karl Lea".**

**No. Crim. 3:99CR156(AWT).**

United States District Court, D. Connecticut.

Feb. 2, 2001.

318

James G. Genco, U.S. Attorney, Hartford, CT, Stephen C. Robinson, U.S. Attorney's Office, New Haven, CT, for U.S., Plaintiff.

Jeremiah F. Donovan, Old Saybrook, CT, for Richard S. Markey.

Michael Stanton Hillis, Stan R. Dombroski, Stan R. Dombroski, Dombroski, Knapsack & Hills, New Haven, CT, for Joseph W. Simpson.

### RULING ON MOTION TO SUPPRESS

THOMPSON, District Judge.

Defendant Richard S. Markey moved to suppress all evidence seized pursuant to a search warrant issued by a United States magistrate judge on July 16, 1999. The search warrant authorized the search of the defendant's residence at 12 Kerr Farm Road, Simsbury, Connecticut and the seizure of records and other items relating to a scheme to defraud Markey is alleged to have conducted using the name Marquis International Holdings. The warrant was executed that night by agents of the Federal Bureau of Investigation and the United States Postal Inspection Service. Markey attacked the search warrant claiming

(i) that there was no probable cause to search his residence; (ii) that the affidavit contained a false statement and he was entitled to a *Franks* hearing; (iii) that the search warrant was defective because it was overly broad; and (iv) that the agents exceeded the scope of the warrant in seizing certain property. For the reasons that follow, the motion was denied.

## I. *Factual Background*

On July 12, 1999, a complaint was received by the Federal Bureau of Investigation from the Simsbury Police Department concerning a suspected fraudulent telemarketing scheme, operating under the name Marquis International Holdings ("Marquis International"). The principal suspect in this scheme was Richard S. Markey, who resided at 12 Kerr Farm Road, Simsbury, Connecticut. Markey was already known to the FBI and Postal Inspectors in connection with an active investigation into telemarketing schemes utilizing the names Northcoast Telecom and Northstar Direct International.

A preliminary investigation revealed that Markey was representing to investors that Marquis International would conduct "trades" pursuant to which investors would earn interest of 70% or more each month, that the returns were "all guaranteed by contract and placed with major financial institutions throughout the world," and that the "original principal investment never leaves the bank." The investigation also revealed that, similar to a classic Ponzi scheme, Markey encouraged investors to recruit other individuals to invest money with Marquis International by promising them that they would receive higher rates of return on their own investment as the number of investors increased and that they would receive payment equal to 5% of the money invested by the new people they recruited. Investors, who appeared to number in the thousands, were instructed to mail their application forms with "certified bank checks or money orders" to the private mail box of Marquis Interna-

tional, 542 Hopmeadow Street, PMB 149, Simsbury, Connecticut, 06070.

The investigators also learned that Markey participated in telephone conference calls where potential investors would call a specified telephone number at a designated time and receive answers to questions they might have about the Marquis International investment program. These conference calls involved large numbers of callers from across the United States.

Postal Inspectors learned that the private mail box to which the application forms and checks or money orders were being sent had been rented from Mail Boxes, Etc. by Richard Markey. In renting that box, Markey used his home address of 12 Kerr Farm Road, Simsbury, Connecticut and provided a copy of his Connecticut drivers license confirming that address was his residence. The address of the private mail box, i.e., 542 Hopmeadow Street, PMB 149, Simsbury, Connecticut, 06070, was used by Markey as the address for Marquis International.

Fleet Bank records showed that Markey had deposited $1,457,563.00 into a Marquis International account over a three-day period from June 30 to July 2, 1999, and that he had wire transferred $1.25 million of those funds out of the country on July 13, 1999. Richard Markey was listed as the president and owner of Marquis International on this account and Carol A. Mallon was listed as its treasurer.

Postal Inspector Robert Bova went to Mail Boxes, Etc., on July 14, 1999, and again on July 15, 1999, and observed there several hundred pieces of express mail addressed to Marquis International.

On July 15, 1999, a postal letter carrier who delivered mail to Markey's residence informed Inspector Bova that he had observed a bunch of telephones and other gadgets on a table in the garage at that residence.

Also on July 15, 1999, FBI Special Agent Joseph Nates interviewed an individual who acknowledged sending money

to Marquis International at its address in Simsbury, i.e., the private mail box. This individual stated, among other things, that he had participated in a telephone conference call with Karl Lea, who was an associate of Markey. This individual had been told that the money sent to Marquis International would be traded in discount bonds and that he could expect a return of "six figures" on a thousand dollar investment in a year. This investor had been told that there would be monthly trades and that each investor would receive 50% of the monthly profits. This information was the same, or consistent with the, information contained in Marquis International's written solicitations that had been obtained by the investigators.

Agent Nates listened to a Marquis International conference call for investors on July 15, 1999. The person representing Marquis International refused to give his last name, but stated he was "Tom from Wisconsin." This representative was evasive when asked to identify the specific instruments in which Marquis International would invest. He stated only that they were "international bank debentures." He claimed Markey was connected to the six wealthiest families in the world and that was how he was able to obtain such phenomenal returns. All of the "investors" were instructed not to release this information to anyone they did not know.

Also, during the evening of July 15, 1999, Inspector Bova, who had seen Markey's photograph on the copy of the driver's license Markey provided to Mail Boxes, Etc. and from a copy of Markey's driver's license photo which had been faxed to him from the Department of Motor Vehicles, observed a person he believed to be Markey sitting in a gray Chrysler automobile in the driveway at 12 Kerr Farm Road. A check on the license plate of the automobile showed that the car was registered to Richard S. Markey at that address.

On July 16, 1999, Agent Nates spoke with bank personnel from Fleet Bank who advised him that on that day, at approximately 10:30 a.m., a deposit had been made to the account of Marquis International. The deposit consisted of approximately 200 checks in the aggregate amount of $717,930.00.

Also, on July 16, 1999, Agent Nates spoke with Sidney A. Igdalsky, a supervisory examiner in the Securities and Business Investment Division of the Connecticut Department of Banking. Igdalsky's office had recently received an inquiry which led him to open an investigation of Marquis International. Igdalsky advised that he had reviewed Marquis International documents forwarded to Agent Nates by the Simsbury Police Department, as well as the documents provided by another Marquis International investor; Igdalsky advised that the pitch used was very typical of fraudulent investment schemes involving bank instruments. Igdalsky also informed Agent Nates that he had listened to a Marquis International conference call on July 15, 1999 and heard a person who identified himself as "Rick Marquis" on the telephone. Igdalsky stated that he had investigated several similar cases involving this type of fraud and had extensively researched this area of fraud, and he advised that, based on his experience and expertise, there was no such investment instrument as that being described by Marquis International.

During the course of their investigation, the Postal Inspectors and the FBI found no indication that Markey had any office outside his home. To the contrary, all indications were that he was conducting the alleged scheme from his residence.

Consequently, the agents applied for and obtained a search warrant for 12 Kerr Farm Road, Simsbury, Connecticut, which was issued at 6:20 p.m. on July 16, 1999. The search authorized the search for and seizure of evidence relating to the telemarketing scheme being operated by Markey from his residence at 12 Kerr Farm Road, Simsbury, Connecticut. The search

warrant was executed late that same day. Markey was not present at the outset, but was reached by his wife on his cellular telephone and returned home within two hours. The agents did not have an arrest warrant. When Markey returned home, he agreed to talk to the agents and was advised of his *Miranda* rights, even though he was not in custody. He stated he was willing to answer questions and talked to the agents for about one-half hour. After Markey admitted that he had in fact made false statements to investors to induce them to send money to Marquis International, he was placed under arrest.

Although the defendant was under investigation for his conduct relating to Northstar Direct International and Northcoast Telecom, the agents limited their search to Marquis International documents only. The only records seized relating to Northstar Direct International or Northcoast Telecom were records that were intermingled in stacks of Marquis International papers or in Markey's briefcase (which is discussed below) and inadvertently seized, or telephone records that potentially reflected calls made on behalf of Marquis International. Those documents constituted roughly one percent of the documents seized.

The team of law enforcement officers who conducted the search met twice before executing the search warrant. At the initial meeting, at the offices of the U.S. Attorney, drafts of Agent Nates' affidavit and the search warrant were distributed. Then, just prior to the execution of the search warrant, the group met again for a final briefing as to the scope of the search warrant. The agents were explicitly instructed by Inspector Bova that, although Mr. Markey had also been operating Northstar Direct International and Northcoast Telecom, the search was to be limited to documents related to Marquis International. The agents seized eleven boxes of documents relating to Marquis International; had they seized the documents they identified as relating to Northstar Direct

International, those documents would have filled about four additional boxes. Although the members of the search team were made familiar with the contents of Agent Nates' affidavit, that affidavit was not made an attachment to the search warrant.

At one point during the search, some of the agents came across numerous documents related to Northstar Direct International and Northcoast Telecom, which were clearly identifiable as such. Those agents were concerned that those documents were evidence of illegal activity and double-checked with Agent Nates and Inspector Bova as to whether those documents should be seized. They were told that they could not seize those documents.

The agents also seized Mr. Markey's briefcase. One of the other agents brought the briefcase to the attention of Agent Nates when he determined that it contained certain correspondence between Markey and Carol Mallon, who was not only the Treasurer of Marquis International but Markey's girlfriend. The briefcase contained a myriad of documents relating not only to Marquis International but to a number of other matters, such as Northstar Direct International, Northern Telecom, and personal correspondence and sexually explicit materials. It was only apparent in hindsight that some of the records, such as telephone records, did not relate to Marquis International. The briefcase was so full that it could barely be closed. The agents decided to seize the entire briefcase and sort through the contents later. It took Agent Nates and Agent Bova one to one and a half hours to do so. They found over one hundred documents that related to Marquis International; these documents ranged in size from small receipts to two- and three-page documents. Approximately 50 of those items were marked as exhibits for trial. However, the clear majority of the documents did not relate to Marquis International, and after the relevant material was removed, the briefcase was still very full. The brief-

case was produced for examination by the court.

Computerized records and computer equipment were covered by the search warrant, and the agents also seized Markey's computer. Agent Nates' affidavit described in detail the procedure that would be followed if an on-site analysis of the data contained in the computer was not practical or feasible. When the agent who was the computer specialist arrived at the scene, it was about 9 p.m. He concluded that, assuming no problems, it would have taken at least several hours for him to perform the complicated procedures involved in imaging and forensically processing the computer.

Although the postal letter carrier had reported to Inspector Bova that he had observed a bunch of telephones and other gadgets on a table in the garage at Markey's residence and that statement had been included in the affidavit in support of the application for the search warrant, the agents found only a single telephone and a caller identification box when they executed the search warrant.

## II. *Discussion*

### A. *Probable Cause to Search 12 Kerr Farm Road*

Markey argues that the application for the search warrant failed to set forth probable cause to believe that evidence relating to Marquis International would be found in his residence at 12 Kerr Farm Road, Simsbury, Connecticut. The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause." Const. Amend. IV. The task of determining probable cause requires the magistrate judge "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before her, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v.*

*Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *See also United States v. Diaz,* 176 F.3d 52, 110 (2d Cir. 1999) (probable cause for a search warrant is established if the 'totality of the circumstances' indicate a probability of criminal activity); *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983) (there should exist a "fair probability that the premises will yield the objects specified in the search warrant").

■ A defendant who argues that a warrant was issued on less than probable cause faces a very heavy burden. *Rivera v. United States,* 928 F.2d 592, 602 (2d Cir.1991). Once a warrant has been issued, the magistrate judge's finding of probable cause is entitled to substantial deference by the reviewing court. *United States v. Rosa,* 11 F.3d 315, 326 (2d Cir. 1993); *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Travisano,* 724 F.2d at 345; *United States v. Zucco,* 694 F.2d 44, 46 (2d Cir.1982). The reviewing court is not to review the issue of probable cause *de novo. Gates,* 462 U.S. at 236, 103 S.Ct. 2317; *Rosa,* 11 F.3d at 326; *Travisano,* 724 F.2d at 345. "A reviewing court should not interpret supporting affidavits in a hypertechnical, rather than a commonsense manner." *United States v. Martin,* 157 F.3d 46, 52 (2d Cir.1998). "Any doubt regarding the existence of probable cause must be resolved in favor of upholding the warrant." *United States v. Salameh,* 152 F.3d 88, 113 (2d Cir.1998); *Rosa,* 11 F.3d at 326.

■ Markey claims that the search warrant application was defective because it did not establish that Marquis International had any connection with Markey's residence at 12 Kerr Farm Road. The court concludes, however, that the affidavit in support of the search warrant does establish a sufficient connection.

The affidavit stated that investors were instructed to mail checks or money orders to Marquis International's postal mail box

with Mail Boxes, Etc. in Simsbury. It also stated that the investigators had determined that that mail box was opened by Markey using his home address of 12 Kerr Farm Road, Simsbury. The affidavit stated further that "Markey has no known office outside the home and appears to work exclusively from this location." [Affid., ¶ 6]. Markey contends that this statement was the agent's own summary conclusion. Markey points to the fact that no mail for Marquis International had been sent to 12 Kerr Farm Road, and that nowhere in the bank records or records of Mail Boxes, Etc. was 12 Kerr Farm Road listed as the address for Marquis International.

A commonsense reading of Agent Nates' affidavit is that the conclusion by the investigators that Markey had no known office outside his home and appeared to work exclusively from his residence at 12 Kerr Farm Road was based not only on the information obtained from Mail Boxes, Etc. and the additional observations of the investigators during their inquiry into Marquis International, but also on the knowledge acquired by investigators in connection with their inquiries into Northcoast Telecom and Northstar Direct International. The record shows that there was a more than sufficient basis for this statement in the affidavit and that it was not a mere summary conclusion on the part of Agent Nates. It was true, as stated in the affidavit, that Markey had been the subject of an open investigation in relation to Northcoast Telecom and Northstar Direct International since February 1998. It was also the case that Marquis International was required to furnish its "business address" on the application for the postal mail box with Mail Boxes, Etc. The address it gave was Postal Mail Box 149 itself, and the only other address given on that application by Richard Markey was 12 Kerr Farm Road; on the agreement with Mail Boxes, Etc., Markey gave as his address a second postal mail box, i.e., PMB 324 with Mail Boxes, Etc. in Avon, Connecticut. It was not possible that any

substantial part of the records of Marquis International were being stored in either of these postal mail boxes. Also, the only address known to the investigators for the "members" of Marquis International whose mail was to be received at PMB 149 (i.e., Markey and "Damien Marquis") was 12 Kerr Farm Road, which was given as Markey's address. Moreover, the investigators had also reviewed records from Fleet Bank as to Marquis International. Finally, even though the postal letter carrier's report of having seen a bunch of telephones and other gadgets on a table in the garage at 12 Kerr Farm Road was most likely an erroneous report, it was accurately reflected in the search warrant affidavit, which attributed to the letter carrier a statement that he had seen a large number of telephones set up in the garage.

Given all of the circumstances set forth in the affidavit that was submitted to the magistrate judge, there was probable cause to believe that the business of Marquis International was being conducted at least in part from 12 Kerr Farm Road and that records relating to Marquis International would be found there.

### B. *Franks Hearing*

The defendant moved for a *Franks* hearing on the grounds that the affidavit in support of the search warrant application states that the affiant, Agent Nates, was informed by Inspector Bova that Bova was told by a postal letter carrier that the letter carrier observed a large number of telephones set up in the garage at 12 Kerr Farm Road, when, in fact, at the time of the search there was only one telephone there. The defendant contends that no letter carrier could have observed and reported to Inspector Bova the presence of a large number of telephones in the garage.

The postal letter carrier conceded, at the suppression hearing, that what he actually saw in the garage was one telephone, possibly a second telephone, and some gadgets on the tables with the tele-

**324**

phone(s). However, the letter carrier also confirmed that he told Inspector Bova that he observed a bunch of telephones and other gadgets on a table in the garage.

In *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that where a defendant makes a substantial preliminary showing that (1) the affidavit upon which a search warrant was granted contained a false statement that was made knowingly and intentionally, or with reckless disregard for the truth, and (2) the allegedly false statement is necessary to the finding of probable cause, he is entitled to a hearing. *Id.* at 170–72, 98 S.Ct. 2674; *See also Rivera v. United States,* 928 F.2d 592, 604 (2d Cir.1991); *United States v. Levasseur,* 816 F.2d 37 (2d Cir.1987).

Allegations that amount to negligence or innocent mistake do not constitute the required showing. The focus is not on whether a mistake was made, but rather on the intention behind the mistake. *Beard v. City of Northglenn,* 24 F.3d 110, 116 (10th Cir.1994). *See United States v. Trzaska,* 111 F.3d 1019, 1028 (2d Cir.1997) ("Whether a person acted deliberately or recklessly is a factual question of intent."). *Franks* does not require that all statements in an affidavit be true; it simply requires that the statements be 'believed or appropriately accepted by the affiant as true.' *United States v. Campino,* 890 F.2d 588, 592 (2d Cir.1989), citing *Franks,* 438 U.S. at 165, 98 S.Ct. 2674.

To demonstrate recklessness, a defendant must show that the officer " 'in fact entertained serious doubts as to the truth of his allegations ... and [a] fact finder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity' of the allegations.' " *Beard,* 24 F.3d at 116 (quoting *United States v. Williams,* 737 F.2d 594, 602 (7th Cir.1984), quoting *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). *See United States v. Millar,* 79 F.3d 338, 342–43 (2d Cir.1996)

(defendant failed to show deliberate falsehood or recklessness where no evidence of "deliberate prevarication").

Markey has failed to make the substantial preliminary showing required to warrant a *Franks* hearing. To the extent that he relies on the fact that there was only a single telephone in the garage and not a bunch of telephones, as was reported to Inspector Bova, his argument fails because this discrepancy does not reflect on the truthfulness of the affiant, Agent Nates, or Inspector Bova, his fellow law enforcement official who was the source of the information. The agents were simply relating to the court information that was provided by the postal letter carrier. *Franks* is implicated only when the false statement is made by, or the reckless disregard is that of, the affiant. There is no right to a hearing when the challenge is to information provided by an informant or other source. *Franks,* 438 U.S. at 171, 98 S.Ct. 2674.

To the extent the defendant relies on the fact that the postal letter carrier referred to a bunch of telephones and other gadgets, while the affidavit referred to a large number of telephones, his argument also fails. While the affidavit does not recite precisely what the postal letter carrier reported to Inspector Bova, there is no indication that the variance between the language used by the postal letter carrier and that used in the affidavit was an intentional or knowing misstatement, or the result of a reckless disregard for the truth, and even if the specific language used by the letter carrier had been included in the affidavit, the issuance of the search warrant would still have been justified. See *United States v. Mankani,* 738 F.2d 538, 545–46 (2d Cir.1984).

C. *Particularity of the Search Warrant; Good Faith Exception*

Markey also contends that the search warrant was defective because it was overly broad. The particularity requirement of

the Fourth Amendment is intended to restrict the scope of searches conducted pursuant to lawful search authority. *Stanford v. Texas,* 379 U.S. 476, 481–86, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). "[T]he specific evil is the general warrant abhorred by the colonists, and the problem is not that of the intrusion *per se,* but of a general, exploratory rummaging of a person's belongings." *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

In *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927), one of the earliest and most frequently quoted opinions addressing the particularity requirement, the Court observed:

> The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is taken, nothing is left to the discretion of the officer executing the warrant.

However, as the Court of Appeals for the Second Circuit has noted:

> Although often cited, this passage from *Marron* has not always been applied literally. Courts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant. *See Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). (Additional citations omitted)

*United States v. Young,* 745 F.2d 733, 759 (2d Cir.1984) (citations omitted).

A warrant which describes "in both specific and inclusive generic terms what is to be seized .... [such as] 'all folders ... all checks ... all general ledgers [and] all correspondence'" relating to a specific suspected crime is proper since in some circumstances a more precise description is not feasible. *United States v. Christine,* 687 F.2d 749, 753, 760 (3rd Cir.1982). Furthermore, the general clause in the warrant at issue in *Christine,* which authorized the seizure of "all other documents, papers, instrumentalities and fruits of the crime," was found not to constitute a general search. *Id.* at 753.

■ In *United States v. Riley,* 906 F.2d 841, 844–45 (2d Cir.1990), the court upheld the seizure of evidence against particularity challenges, observing that "[i]n upholding broadly worded categories of items available for seizure, we have noted that the language of a warrant is to be construed in light of an illustrative list of seizable items." Specifically, the court held that:

> Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category.

*Id.* 906 F.2d at 845. In short, a search warrant is sufficiently particular where it enables the agents executing the warrant to ascertain and identify with reasonable certainty those items which the judicial officer has authorized them to seize. *United States v. George,* 975 F.2d 72, 75 (2d Cir.1992).

■ Markey contends that the search warrant permitted a general search. He points to the fact that the warrant authorized, *inter alia,* the seizure of specific categories of books, records and other documents "relating to Marquis International, Marquis International Holdings and/or Richard Markey and[/]or Carol A. Mallon." It also authorized, *inter alia,* the seizure of "telephone and telegram records, including, but not limited to, faxes, telephone logs and telephone messages." He notes that the warrant therefore authorized the seizure of any book, record or other docu-

ment relating to Richard Markey, and the seizure of any telephone and telegram record on the premises, even if it had nothing to do with the scheme alleged in the search warrant application.

While the points Markey makes as to certain aspects of the search warrant appear to have merit, the court need not resolve each of these issues because it concludes that, assuming *arguendo* that the search warrant was not sufficiently particular, the "good faith" exception to the exclusionary rule is applicable here.

 Evidence is still admissible at trial even if seized pursuant to a defective warrant if "an officer acting with objective good faith ... obtained a search warrant from a judge or a magistrate and acted within its scope." *United States v. Leon,* 468 U.S. 897, 920, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). "The test of objective good faith is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Moore,* 968 F.2d 216, 222 (2d Cir.1992) (quoting *Leon,* 468 U.S. at 922, n. 23, 104 S.Ct. 3405) "[S]uppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Leon,* 468 U.S. at 918, 104 S.Ct. 3405.

 There are certain situations where the good faith exception does not apply, namely, (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application for the search warrant is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable. *Id.* at 923, 104 S.Ct. 3405.

The only one of these four limitations on the "good faith" exception that requires discussion here is the last of the four. In *Leon,* the court stated:

> Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

*Id.* at 923.

The circumstances of this case are not such that the executing officers could not reasonably presume the warrant to be valid notwithstanding any deficiencies that may have been apparent on the face of the warrant. First, this is not an instance where deficient language in a portion of the warrant authorizes a "wide-ranging exploratory search." *United States v. George,* 975 F.2d 72, 75 (2d Cir.1992) (quoting *Maryland v. Garrison,* 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987)). In *George,* for example, the deficient language, which was tacked on at the end of a specific list, was "any other evidence relating to the commission of a crime." *George,* 975 F.2d at 74. Second, this was a situation where the "all records" exception to the particularity requirement was applicable. Agent Nate's affidavit provided adequate support for a finding of probable cause that Marquis International's entire business operation was illegal. "When the criminal activity pervades that entire business, seizure of all records of the business is appropriate, and broad language used in warrants will not offend the particularity requirements." *U.S. Postal Service v. C.E.C. Services,* 869 F.2d 184, 187 (2d Cir.1989). Third, the agents were instructed that there was to be a limited search for items related to Marquis International, and they took care to follow those instructions. Fourth, none of the items seized during the search was authorized to be seized only pursuant to any deficient language in the search warrant. Finally, although Agent Nate's affidavit was not an attachment to the search warrant, it was specifically reviewed by the agent who

served as the evidence custodian for the purpose of familiarizing herself with the contents and the general nature of the allegations; this was in addition to the instructions given by Agent Nates and Inspector Bova to the search team. *Cf. George,* 975 F.2d at 76 ("Resort to an affidavit to remedy a warrant's lack of particularity is available only when it is incorporated by reference in the warrant itself and attached to it.").

The court concludes that under these circumstances the agents executing the search warrant reasonably perceived it to be valid, and the agents conducted the search in good faith reliance on the magistrate judge's issuance of the warrant.

### D. *Seizure of Items Not Specified in the Warrant*

 Finally, Markey argues that the agents exceeded the authorized scope of the warrant by seizing documents related to Northstar Direct International and Northcoast Telecom, by seizing Markey's briefcase, which contained not only documents related to Northstar Direct International and Northcoast Telecom but also documents of a purely personal nature, and by seizing Markey's computer.

As discussed above, the agents attempted to limit the documents seized to ones related to Marquis International, and took care to avoid seizing papers they identified as relating to Northstar Direct International and Northcoast Telecom. Any records of Northstar Direct International or Northcoast Telecom that were seized were taken because the agents believed those documents related directly to Marquis International (i.e., telephone records) or because they were inadvertently seized as part of a large group of seized documents related to Marquis International.

 As to the briefcase, Markey contends that the agents should have given Markey the choice of either consenting to the agents taking the entire briefcase and sorting through it later, or having the

agents stay at Markey's home that night until a document-by-document examination was completed. Markey makes a comparable argument as to the computer that was seized. This was a situation where the principal in the business enterprise kept all his receipts and other documents in a very disorganized fashion; receipts for one enterprise were not segregated from those for others. As to the briefcase specifically, it was clear to the agents that it contained a significant amount of material that should be seized but was haphazardly intermingled with other materials. While the agents were able to review the contents of the briefcase in one to one and a half hours subsequently, this was with the benefit of the knowledge gained by virtue of the search, and it appears it would have taken significantly longer to review the contents at the scene of the search. Although it may have been preferable to give Markey the choice he articulates, the agents acted in good faith in seizing the briefcase, rather than prolonging the search into the middle of the night. This is not a situation where there was such flagrant disregard for the terms of the warrant that all seized evidence, not just any improperly seized evidence, should be suppressed. *See United States v. Medlin,* 798 F.2d 407, 411 (10th Cir.1986) ("The rule is that only the improperly seized evidence, not all of the evidence, must be suppressed, unless there was a flagrant disregard for the terms of the warrant.") (citing *Waller v. Georgia,* 467 U.S. 39, 44 n. 3, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984)).

As to the computer, the search warrant authorized the seizure of the computer, and the procedures that the computer specialist would follow were spelled out in Agent Nates' affidavit, which specifically made reference to the possibility of an off-site review. Even assuming, *arguendo,* that the seizure of the computer was not authorized, the "good faith" exception to the exclusionary rule would be applicable.

### III. *Conclusion*

For the reasons set forth above, defendant Markey's motion to suppress (doc. # 43) was denied.

It is so ordered.