**UNITED STATES of America**

v.

**Robert LUSTYIK, Johannes Thaler, and Rizve Ahmed, a/k/a "Caesar," Defendants.**

**No. 13 CR 616(VB).**

United States District Court, S.D. New York.

Signed Sept. 29, 2014.

Robert A. Soloway, Rothman, Schneider, Soloway & Stern, LLP, Jason Immanuel Ser, Federal Defenders of New York Inc., Bradley Lamar Henry, The Blanch Law Firm, P.C., New York, NY, Joseph A. Vita, Joseph A. Vita Law Office, Port Chester, NY, for Defendants.

Emily Rae Woods, United States Department of Justice, Criminal Division, Washington, DC, Benjamin Rial Allee, U.S. Attorney's Office, White Plains, White Plains, NY, for United States of America.

### MEMORANDUM DECISION

BRICCETTI, District Judge:

Defendants Robert Lustyik, Jr., Yohannes Thaler, and Rizve Ahmed, a/k/a "Caesar," are charged with various federal crimes relating to an alleged bribery scheme.[1] Lustyik, who at the time was a

---

1. Specifically, the indictment charges all three defendants with conspiracy to bribe a public official (18 U.S.C. § 371) and conspiracy to commit wire fraud and honest services fraud (*id.* § 1349). Lustyik is also charged with theft of government property (*id.* § 641); unauthorized disclosure of a Suspicious Activity Report (*id.* § 5322(a)); and soliciting bribes (*id.* § 201(b)(2)(C)). Thaler is charged with soliciting bribes (*id.*) and receiving stolen government property (18 U.S.C. § 641). And Ahmed is charged with receiving stolen government property (*id.*) and offering bribes to a public official (18 U.S.C. § 201(b)(1)(C)). (Doc. # 9).

special agent with the Federal Bureau of Investigation ("FBI"), is accused of selling and agreeing to sell confidential FBI documents and information to Ahmed, with Thaler acting as a middleman.

Before the Court are Lustyik's and Thaler's motions to suppress digital evidence seized pursuant to several search warrants.[2] (Docs. ## 74, 77). Thaler has also moved to suppress the statements he made to agents during and after the execution of a search warrant at his home.[3]

For the following reasons, the motions are DENIED.

## BACKGROUND

The following facts are taken from the exhibits submitted in connection with the pending motions, and from the testimony and exhibits received at a suppression hearing held on August 26, 2014.

### I. Investigation of Michael Taylor

This case arises out of a government procurement fraud investigation that culminated in the indictment of four defendants in the District of Utah. *See United States v. Young*, 12 CR 502 (D.Utah) (*"Young"*). One of the individuals indicted in *Young* was Michael Taylor, a business associate of Lustyik and Thaler.

Investigators in *Young* obtained and executed search warrants for Taylor's email account and certain of his electronic de-

vices. In reviewing emails seized pursuant to those warrants, an agent with the Justice Department's Defense Criminal Investigative Service read emails that he believed revealed Lustyik's efforts to obstruct the investigation into Taylor. The agent sent these emails to the United States Attorney's Office for the District of Utah, which in turn relayed them to the Justice Department's Office of the Inspector General ("OIG"), the agency responsible for investigating alleged misconduct by Justice Department employees. OIG, together with prosecutors from the Justice Department, then began investigating Lustyik for obstruction of justice. OIG Special Agent Thomas Hopkins was assigned to be the lead case agent.

### II. The Lustyik Warrants

Relying on emails seized from Taylor's email account, the government obtained a search warrant for Lustyik's email account on May 23, 2012. (GX 7 ("May 2012 Lustyik Warrant")).[4] The May 2012 Lustyik Warrant consisted of a warrant form and two attachments, Attachments A and B. Section I of Attachment B directed Lustyik's email service provider to create a duplicate of his entire email account for the government to search. Section III of Attachment B listed the "Records and Data" the government was authorized to seize. (*Id.*). Section III described the items to be seized as "[e]vidence, fruits, or instru-

---

**2.** Lustyik and Thaler have also been indicted in the District of Utah for conspiracy, wire fraud, and obstruction of justice. *See United States v. Lustyik*, 12 CR 645 (D.Utah). In the Utah case, Lustyik and Thaler filed motions to suppress that are substantially similar to the pending motions, attacking the same warrants and raising many of the same arguments. The Utah District Court denied the motions to suppress. *United States v. Lustyik*, 2014 WL 1494019 (D.Utah Apr. 16, 2014). However, the government concedes the doctrine of collateral estoppel does not bar Lusty-

ik and Thaler from making the pending motions. (Gov't Mem. at 9 n. 4).

**3.** In a bench ruling on July 31, 2014, the Court denied Ahmed's separate motions to suppress physical evidence and post-arrest statements.

**4.** "GX" refers to exhibits offered by the government and received by the Court in connection with the August 26, 2014, suppression hearing.

mentalities of violation of 18 U.S.C. § 1503(a) ["Section 1503"] ... including, without limitation, information relating to" eleven categories, such as "[a]ll records or communications consisting of or pertaining to Robert Lustyik's contact with individuals concerning the investigation of Michael Taylor." (*Id.*). But in the part of the warrant form directing the applicant to "describe the property to be seized," the form stated, "*See Section II* of Attachment B," not Section III.[5] (*Id.* (emphasis added)).

The May 2012 Lustyik Warrant did not contain any search protocols limiting the manner in which the government could search Lustyik's email account. The Warrant did not, for example, require the government to perform keyword searches to identify emails potentially within the Warrant's scope. Accordingly, using an online document review platform called Relativity, a team of reviewers inspected every email in Lustyik's account (with the exception of emails that were removed from the Relativity database either because they were privileged or fell outside the Warrant's date range). Reviewers marked each email as "relevant," meaning the email was within the scope of the Warrant, "not sure," or "not relevant," meaning the email fell outside the scope of the Warrant. Emails marked as either "not sure" or "not relevant" were *not* deleted from the Relativity database.

The government obtained additional search warrants for Lustyik's email account in August 2012 ("August 2012 Lustyik Warrant") and January 2013, as well as search warrants for his smartphone in September and December 2012. (GX 8, 9, 15; Gov't Mem. Ex. F (collectively, with

the May 2012 Lustyik Warrant, the "Lustyik Warrants")).[6] Like the May 2012 Lustyik Warrant, the August 2012 Lustyik Warrant comprised a warrant form and Attachments A and B. (GX 8). In describing the "property to be seized," the warrant form in the August 2012 Lustyik Warrant referred only to Section II of Attachment B. (*Id.*). It did not refer to Section III, which, like its counterpart in the May 2012 Lustyik Warrant, identified the crimes for which evidence was sought and provided an illustrative list of items to be seized. None of the Lustyik Warrants issued between August 2012 and January 2013 contained search protocols restricting the manner in which the government could search Lustyik's email account or smartphone. Thus, as with the May 2012 Lustyik Warrant, the government examined the full contents of Lustyik's email account and smartphone (save only privileged communications or communications outside the other Lustyik Warrants' date parameters).

### III. *The Thaler Warrants*

The government also obtained warrants for Thaler's email account and smartphone (GX 10–12 (collectively, the "Thaler Warrants")), as well as his home. (Gov't Mem. Ex. I).

The first Thaler Warrant, issued June 13, 2012, permitted the government to search Thaler's entire email account. (GX 10 ("June 2012 Thaler Warrant")). Agent Hopkins submitted an affidavit in support of the government's application for the June 2012 Thaler Warrant. In substance, the affidavit discussed the investigation into Taylor, noting that "[c]riminal indictment of Taylor in the District of Utah

---

**5.** Section II defined the "Accounts and Files to be Copied" by Lustyik's email service provider. (*Id.*). As noted above, the service provider copied Lustyik's entire email account.

**6.** The government also secured search warrants for Lustyik's residence and work space at the FBI's office in White Plains, New York. (Gov't Mem. Exs. C, E).

[wa]s being pursued," and described Lustyik's efforts to obstruct the investigation. (June 2012 Hopkins Aff. ¶¶ 5–9, 26–44). The affidavit quoted emails in which Lustyik asked investigators and prosecutors in *Young* not to indict Taylor, or at least to "give me a heads up before u guys indict him" (*id.* ¶ 40), because Lustyik wanted to use Taylor as a confidential FBI source. According to the affidavit, Lustyik gave the lead *Young* prosecutor FBI 302 reports [7] to prove "why Taylor was valuable as a confidential source." (*Id.* ¶ 34). But the reports "appear[ed] to deviate from standard FBI 302 reports, in that they [we]re unsigned and [did] not have a file number ... [and] were unaccompanied by any indication that their creation or dissemination was authorized by FBI supervisory personnel, in apparent violation of FBI policy." (*Id.* ¶ 35).

Agent Hopkins's affidavit also detailed the business relationship among Lustyik, Thaler, and Taylor, and asserted there was probable cause to believe Thaler used his email account to communicate with Lustyik and Taylor about business opportunities. (*Id.* ¶¶ 3, 13–20). To support that assertion, the affidavit cited emails between Thaler and Taylor, copying Lustyik, discussing potential contracts to provide security for oil drilling operations in Iraq. (*Id.* ¶ 19).

And the affidavit made clear Thaler used his email account to communicate not only about potential business ventures, but also about Lustyik's attempts to thwart the investigation into Taylor. The affidavit quotes a May 14, 2012, email chain that begins with Taylor informing Lustyik that Taylor's attorney believes Taylor will be indicted. (*Id.* ¶ 25). Lustyik forwarded Taylor's email to Thaler, who responded, "I know. This doesn't sound good. [Taylor] told me a while back his family would be better off with him dead than indicted." (*Id.*). Lustyik replied, "I've done everything possible. The [Assistant United States Attorney] is crazy." (*Id.*).

Like the Lustyik Warrants, each Thaler Warrant was composed of a warrant form along with Attachments A and B. Section III of Attachment B to the June 2012 Thaler Warrant authorized the seizure of "[e]vidence, fruits, or instrumentalities of [obstruction of justice under Section 1503] involving Robert Lustyik or Michael Taylor since January 1, 2009, including, without limitation, information relating to" a list of eleven categories substantially similar to the eleven categories enumerated in the May 2012 Lustyik Warrant. (GX 10). At the August 26, 2014, suppression hearing, Agent Hopkins testified he read the illustrative list of items to be seized as "relat[ing] back" to the specified crime or crimes, meaning the government could search only for emails "relating to those alleged violations." (*See* Tr. 268–69).[8]

The warrant form in the June 2012 Thaler Warrant also incorporated Section II—but not Section III—of Attachment B when identifying the "property to be seized" from Thaler's email account. (GX 10). Although the warrant form did not specifically mention Section III, Agent Hopkins credibly testified the government's team of reviewers were "guided by" Section III when reviewing the emails seized pursuant to the June 2012 Thaler Warrant. (Tr. 268).

---

7. "A 302 report is an FBI investigation form containing interview notes made by the interviewing agent." *Evans v. United States*, 284 Fed.Appx. 304, 309 (6th Cir.2008) (summary order).

8. "Tr." refers to the transcript of the August 26, 2014, suppression hearing.

The second Thaler Warrant was issued on September 7, 2012, and also authorized a search of the entire contents of Thaler's email account. (GX 11 ("September 2012 Thaler Warrant" and, together with the June 2012 Thaler Warrant, the "Thaler Email Warrants")). In addition to evidence of obstruction of justice, the September 2012 Thaler Warrant sought evidence of (i) a violation of 18 U.S.C. § 208 ("Section 208"), which bars federal employees from having financial conflicts of interest, and (ii) honest services fraud. Such evidence "includ[ed], without limitation, information relating to" the same eleven categories listed in the June 2012 Thaler Warrant. (GX 11).

Agent Hopkins again submitted a supporting affidavit. In this affidavit he stated he had probable cause to believe Lustyik had violated Section 208 by "open[ing]" Taylor as an FBI source, even though the two had a business relationship that Lustyik had not disclosed to the FBI. (September 2012 Hopkins Aff. ¶¶ 5, 12). With respect to his probable cause to believe Lustyik had committed honest services fraud, Agent Hopkins explained that Lustyik had attempted to derail the investigation into Taylor in exchange for "the prospect of substantial financial gains from the[ir] business relationship." (*Id.* ¶ 5).

Agent Hopkins confirmed at the August 26, 2014, suppression hearing that the government sought evidence of a Section 208 violation because it suspected the agent-source relationship between Lustyik and Taylor was inappropriate. (*See* Tr. 320–21). Agent Hopkins also testified the government's search for evidence of honest services fraud was "premised on Agent Lustyik ... interfering with the investigation of Mr. Taylor." (*Id.* at 322; *see also id.* at 333 (agreeing that "the suspicion for the honest services fraud stemmed allegedly [from] Agent Lustyik trying to inter-fere with the investigation of Mr. Taylor")).

The Thaler Email Warrants were executed on June 15 and September 10, 2012. The government began reviewing the emails seized pursuant to those Warrants within days. Like the Lustyik Warrants, the Thaler Email Warrants did not include search protocols. The government therefore searched Thaler's account in the same email-by-email manner in which it had searched Lustyik's account, marking emails as "relevant," "not sure," or "not relevant," and retaining emails marked as either "not sure" or "not relevant" in the Relativity database.

## IV. *The Re–Coded Emails*

On September 18, 2012, the government executed warrants for Lustyik's and Thaler's smartphones, extracting the phones' entire contents. As it had done with Lustyik's and Thaler's email accounts, the government reviewed the contents of the smartphones without search protocols and retained communications marked as "not sure" or "not relevant."

In searching the smartphones, the government uncovered text messages among Lustyik, Thaler, and Ahmed "explicitly discussing the sale of U.S. government information and documents by Special Agent Lustyik through Mr. Thaler to Mr. Ahmed concerning Sajeeb Wazed Joy," the son of the Prime Minister of Bangladesh. (Tr. 249, 256–57). Joy is a member of the Awami League, one of Bangladesh's two main political parties. Ahmed, a native of Bangladesh, is a member of the Bangladesh Nationalist Party, the Awami League's rival. (*Id.* at 249–50). These text messages prompted the government to re-review the emails seized from Lustyik's and Thaler's accounts. (*Id.* at 259).

Upon re-reviewing emails seized pursuant to the Thaler Email Warrants, the

government concluded eight email chains initially marked as "not relevant" or "not sure" were, in fact, "relevant"—i.e., within the scope of the Thaler Email Warrants— and re-coded them. (GX 17–24 (the "Re-Coded Emails")). Approximately three months elapsed between the date the Re-Coded Emails were seized pursuant to the June 2012 Thaler Warrant and the date they were re-coded.

The Re–Coded Emails generally consist of emails between Thaler and Ahmed in which Ahmed provided Thaler with information about Joy. Two of the emails specifically discussed Ahmed making payments to Lustyik or Thaler. In a March 2, 2012, email to Thaler, an associate of Ahmed's wrote, "I understand you have info for us. . . . [I] gave [Ahmed] the money a while back . . . I'm trying to meet up with him tomorrow so he can take care of this matter." (GX 22). Thaler also forwarded Lustyik a March 12, 2012, email in which Ahmed told Thaler that Ahmed's father had withdrawn $8,500 and that Lustyik could "come anytime before Thursday night" to pick up the money. (GX 18, 23–24).

The Re–Coded Emails, on their face, appear to relate to a scheme described in an October 25, 2011, email chain among Lustyik, Thaler, and Taylor. (GX 14 ("October 25, 2011 Email Chain")). The October 25, 2011, Email Chain was seized pursuant to the June 2012 Thaler Warrant and was marked as "relevant" upon its initial review. In sum and substance, in the October 25, 2011, Email Chain, Lustyik, Thaler, and Taylor discussed a plan to sell Ahmed information provided by a "very high quality source" in Bangladesh known to Taylor. (Id.). In Lustyik's words, his "master plan" was to "use info from Taylor's source within the current Bang govt. and sell it to ceaser's [sic] people. No one knows . . . no one gets

hurt." (Id.). Lustyik surmised such information to be "worth a fortune" to Ahmed and his "people." (Id.).

But as both Agent Hopkins and the government admitted at the August 26, 2014, suppression hearing, it was "ultimately determine[d] that Michael Taylor was [not] involved in the scheme" outlined in the October 25, 2011, Email Chain. (Tr. 255). As the government explained, "the scheme morphed. It went away from what was originally conceived as the use of Taylor's source to sell that information to Ahmed . . . into just the direct sale of documents . . . just selling straight up the documents." (Id. at 393). Lustyik's and Thaler's alleged sale of confidential documents to Ahmed forms the basis of the charges in this case.

## V. *Thaler's Statements to OIG Agents*

OIG agents executed the search warrant for Thaler's home on September 18, 2012. (Gov't Mem. Ex. I). During the search, Thaler was interviewed by two OIG agents. He was interviewed by OIG agents at his home again on September 21, 2012. In those two interviews, Thaler explained Lustyik was a childhood friend of his, and he discussed the business ventures he had with Lustyik and Taylor.

## DISCUSSION

Lustyik moves to suppress all of the evidence seized pursuant to the Lustyik Warrants on the following grounds (i) all such evidence is "fruit of the poisonous tree," *see generally Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), because emails illegally obtained from Taylor's email account provided the probable cause on which the May 2012 Lustyik Warrant was based, thus tainting that Warrant and all subsequent Lustyik Warrants; (ii) the Lustyik Warrants are facially invalid because they

violate the Fourth Amendment's particularity requirement, see *generally Maryland v. Garrison,* 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987); and (iii) the manner in which the government searched his email account and smartphone—that is, without search protocols—amounted to a "general rummaging" for incriminating evidence. *See Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

Thaler also moves to suppress, contending the Thaler Email Warrants were insufficiently particular and the searches of his email account and smartphone were "general rummaging" for evidence because all Thaler Warrants lacked search protocols. He further argues (i) the June 2012 Thaler Warrant was not supported by probable cause; (ii) that Warrant is overbroad; and (iii) the statements he made to the OIG agents during and after the execution of the search warrant for his home must be suppressed as fruit of the deficient Thaler Email Warrants.

The Court addresses defendants' arguments below.

### I. *Lustyik's Standing to Challenge the Search of Taylor's Email Account*

■ Because Lustyik lacks standing to challenge the search of Taylor's email account, the Court rejects his argument that all evidence seized pursuant to the Lustyik Warrants must be suppressed as fruit of the poisonous tree.

■ "A defendant cannot invoke the Fourth Amendment's protections unless he has a legitimate expectation of privacy against the government's intrusion." *United States v. Roy,* 734 F.2d 108, 110 (2d Cir.1984). A person has no expectation of privacy in another person's email account. *United States v. Nazemzadeh,* 2013 WL 544054, at *2 n. 2 (S.D.Cal. Feb. 12, 2013) ("Defendant could have no reasonable ex-

pectation of privacy in the email accounts of others."). Additionally, a person lacks any "expectation of privacy in transmissions over ... e-mail that have already arrived at the recipient." *United States v. Lifshitz,* 369 F.3d 173, 190 (2d Cir.2004); *see also United States v. Knoll,* 16 F.3d 1313, 1321 (2d Cir.1994) ("[W]hen one party relinquishes control of a letter by sending it to a third party, the reasonableness of the privacy expectation is undermined."). Thus, Lustyik lacks an expectation of privacy both in Taylor's email account and in any of his emails received by Taylor. Lustyik therefore cannot show that the search of Taylor's email account and the seizure of emails therefrom—even if unlawful—violated *Lustyik's* Fourth Amendment rights. And "[a]bsent a showing of such a violation, there is no poisonous tree and thus no fruit requiring suppression." *United States v. Knoll,* 16 F.3d at 1322.

Accordingly, Lustyik's motion to suppress is denied insofar as it argues all evidence obtained pursuant the Lustyik Warrants is fruit of the poisonous tree.

### II. *Probable Cause for the June 2012 Thaler Warrant*

■■ Probable cause to search a place exists if "the totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found'" in the place to be searched. *Walczyk v. Rio,* 496 F.3d 139, 156 (2d Cir.2007) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). It is irrelevant whether the owner, proprietor, or inhabitant of the place to be searched is suspected of committing a crime; the "critical element" of a reasonable search is "that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located" in the place to be searched. *Zurcher v. Stanford Daily,* 436

U.S. 547, 556, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978).

■ "All data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath." *United States v. Falso,* 544 F.3d 110, 122 (2d Cir.2008) (internal quotation marks omitted). The affidavit in support of a search warrant therefore must make two factual showings "first, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located [in the place to be searched]." *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983).

■ A district court's evaluation of a warrant "should not take the form of *de novo* review." *Illinois v. Gates,* 462 U.S. at 236, 103 S.Ct. 2317. Rather, "a court reviewing a challenged warrant—whether at the district or appellate level—must accord considerable deference to the probable cause determination of the issuing magistrate." *United States v. Clark,* 638 F.3d 89, 93 (2d Cir.2011) (internal quotation marks omitted). "Thus, the task of a reviewing court is simply to ensure that the totality of the circumstances afforded the magistrate a substantial basis for making the requisite probable cause determination." *Id.* (internal quotation marks omitted).

As set forth below, Agent Hopkins's affidavit provided a substantial basis for concluding there was probable cause to believe evidence of a Section 1503 violation would be found in Thaler's email account.

### A. Evidence of a Section 1503 Violation

Section 1503 requires proof "(1) that there is a pending judicial or grand jury proceeding constituting the administration of justice, (2) that the defendant knew or had notice of the proceeding, and (3) that the defendant acted with the wrongful intent or improper purpose to influence the judicial or grand jury proceeding." *United States v. Quattrone,* 441 F.3d 153, 170 (2d Cir.2006).[9]

■ Agent Hopkins's affidavit offered a substantial basis for finding probable cause to believe both that a grand jury was investigating Taylor, and that Lustyik was aware of the grand jury proceeding. Indeed, the affidavit refers to three emails in which Lustyik discussed the likelihood of Taylor being indicted. (*See* June 2012 Hopkins Aff. ¶¶ 22, 25, 40). In one such email, for example, Lustyik asked one of the agents investigating Taylor to "give me a heads up before u guys indict him." (*Id.* ¶ 40). The affidavit further states, "indictment of Taylor in the District of Utah is being pursued by the [United States Attorney's Office]." (*Id.* ¶ 9).

The affidavit also discusses at length Lustyik's efforts to convince the investigators and prosecutors in *Young* not to indict Taylor because Lustyik wanted to use him as a confidential source. (*Id.* ¶¶ 26–44). The affidavit therefore afforded a substantial basis for finding probable cause to believe Lustyik attempted to influence the grand jury's investigation into Taylor.

---

**9.** *Quattrone* discussed the elements needed to prove a violation of Section 1503's "omnibus clause," which penalizes anyone who "corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503(a). Although the statute proscribes other conduct, such as attempting to influence, intimidate, or impede grand jurors, petit jurors, or court officers in the discharge of their duties, *United States v. Aguilar,* 515 U.S. 593, 598, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995), only the statute's omnibus clause is relevant here.

And the affidavit supplied a substantial basis to find probable cause to believe Lustyik acted with "wrongful intent or improper purpose." *United States v. Quattrone*, 441 F.3d at 170. First, the affidavit includes ample evidence of Lustyik's business relationship with Taylor. (June 2012 Hopkins Aff. ¶¶ 13–20). Although Thaler argues evidence of Lustyik and Taylor's business relationship does not bear on whether Lustyik violated Section 1503 (Thaler Mem. at 13–14), such evidence tends to show Lustyik had a financial interest in preventing Taylor's indictment, thereby permitting an inference that Lustyik "corruptly" tried to influence the investigation for his own personal profit. *United States v. Quattrone*, 441 F.3d at 170.

Second, the affidavit contains facts from which a magistrate judge could conclude Lustyik's proffered (and purportedly legitimate) reason for trying to block Taylor's indictment—his intention to use Taylor as a confidential source—was pretextual. The affidavit states that Lustyik gave the lead *Young* prosecutor FBI 302 reports to show "why Taylor was valuable as a confidential source." (June 2012 Hopkins Aff. ¶ 34). These reports, however, "appear[ed] to deviate from standard FBI 302 reports, in that they are unsigned and do not have a file number ... [and] were unaccompanied by any indication that their creation or dissemination was authorized by FBI supervisory personnel, in apparent violation of FBI policy." (*Id.* ¶ 35).

In sum, Agent Hopkins's affidavit provided a substantial basis to find probable cause to believe Lustyik had obstructed justice in violation of Section 1503.

B. *Finding Evidence of a Section 1503 Violation in Thaler's Email Account*

▮ The affidavit also provided a substantial basis for finding probable cause to believe evidence of Lustyik's obstruction would be found in Thaler's email account. The affidavit cites emails to and from Thaler's account discussing potential business opportunities in Iraq for himself, Lustyik, and Taylor. (*Id.* ¶ 19). As explained above, evidence of Lustyik's business relationship with Taylor is relevant to whether Lustyik tried to obstruct the *Young* investigation with "wrongful intent." *United States v. Quattrone*, 441 F.3d at 170. The affidavit also quotes from a May 14, 2012, email exchange in which Thaler revealed he knew Taylor would likely be indicted, and Lustyik admitted he had tried to prevent Taylor's indictment, writing, "I've done everything possible. The [Assistant United States Attorney] is crazy." (*Id.*).

Accordingly, there was a substantial basis for concluding Agent Hopkins's June 2012 affidavit established probable cause to believe Lustyik had obstructed a grand jury investigation into Taylor, and evidence of that crime would be found in Thaler's email account.

III. *Facial Validity of the Warrants*

Lustyik contends the Lustyik Warrants are facially deficient because they fail to comply with the Fourth Amendment's particularity requirement. Thaler also challenges the particularity of the Thaler Email Warrants, and further argues the June 2012 Thaler Warrant is overbroad.

A. *Particularity*

▮ "The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one particularly describing the place to be searched and the persons or things to be seized." *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) (internal quotation marks omitted). "The particularity requirement has three com-

ponents. First, a warrant must identify the specific offense for which the police have established probable cause. Second, a warrant must describe the place to be searched. Third, the warrant must specify the items to be seized by their relation to designated crimes." *United States v. Galpin*, 720 F.3d 436, 445–46 (2d Cir.2013) (citations and internal quotation marks omitted).

### 1. *Failure to Incorporate Section III of Attachment B into the Warrant Form*

Thaler contends the June 2012 Thaler Warrant fails to satisfy either the first or third components of the particularity requirement because that Warrant does not incorporate Section III of Attachment B, which specified the crime for which evidence was sought and provided an illustrative list of the items to be seized.[10] Rather, in describing the property to be seized, the June 2012 Thaler Warrant form only stated, "See Section II of Attachment B," which identifies the accounts and files to be copied by Thaler's email service provider. (GX 10).

■ Thaler is correct that the government cannot meet the Fourth Amendment's particularity requirement by relying on a document outside the four corners of the warrant form unless the form "uses appropriate words of incorporation, *and* ... the supporting document accompanies the warrant." *See Groh v. Ramirez*, 540 U.S. 551, 557, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (emphasis added) (citing, among other cases, *United States v. Williamson*, 1 F.3d 1134, 1136 n. 1 (10th Cir. 1993), which noted an affidavit submitted

in support of a warrant "can cure a defective warrant only when *both* of two requirements are met first, the affidavit and search warrant must be physically connected so that they constitute one document; and second, the search warrant must expressly refer to the affidavit and incorporate it by reference using suitable words of reference"); *accord United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992) ("Resort to an affidavit to remedy a warrant's lack of particularity is only available when it is incorporated by reference in the warrant itself *and* attached to it." (emphasis added)).

There is no dispute the warrant form in the June 2012 Thaler Warrant, while accompanied by all of Attachment B, does not incorporate Section III of Attachment B.

■ But this shortcoming does not require suppression here, as the "good faith" exception to the Fourth Amendment's exclusionary rule applies. *See generally United States v. Leon*, 468 U.S. 897, 908, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (exclusionary rule inapplicable when "officers have acted in objective good faith" in executing search warrant). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009).

■ "While [courts] may no longer rely on unincorporated, unattached supporting documents to cure a constitutionally defective warrant, those documents are

---

**10.** The warrant forms in the May 2012 and August 2012 Lustyik Warrants likewise did not incorporate Section III of Attachment B. (GX 7–8). Although Lustyik did not move to suppress the evidence seized pursuant to

those Warrants on the ground that their failure to incorporate Section III renders them unconstitutionally unpartikular, Thaler's arguments apply with equal force to those two Lustyik Warrants.

still relevant to our determination of whether the officers acted in good faith, because they contribute to our assessment of the officers' conduct in a particular case." *United States v. Rosa,* 626 F.3d 56, 64 (2d Cir.2010). Unless there is evidence that law enforcement officers "actually relied on the defective warrant, as opposed to their knowledge of the investigation and the contemplated limits of the [issuing magistrate]'s authorization, in executing the search, the requisite levels of deliberateness and culpability justifying suppression are lacking." *Id.* at 66.

██ Here, as in *Rosa,* there is no evidence the government "actually relied on the defective warrant" in reviewing the emails seized pursuant to the June 2012 Thaler Warrant. *Id.* To the contrary, Agent Hopkins testified the government's team of reviewers were "guided by" Section III of Attachment B when executing the June 2012 Thaler Warrant. (Tr. 268). The Court finds this testimony credible, and agrees with the government that "it's apparent from . . . the testimony generally . . . that the method by which [the June 2012 Thaler Warrant] was executed was to incorporate that section of the attachment." (*Id.* at 386).

Accordingly, the failure to incorporate Section III of Attachment B into the warrant form of the June 2012 Thaler Warrant, though enough to render that Warrant insufficiently particular, was "an inadvertent error" not requiring suppression. *United States v. Rosa,* 626 F.3d at 66.

### 2. Use of "Including, Without Limitation" in Section III of Attachment B

Alternatively, Thaler argues the Thaler Email Warrants fail to identify the items to be seized with sufficient particularity because the illustrative lists of items to be seized are preceded by the phrase "includ-

ing, without limitation." Lustyik echoes this argument with respect to the Lustyik Warrants.

██ The purpose of requiring warrants to specify the items to be seized is to prevent "general searches that leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized." *United States v. Riley,* 906 F.2d 841, 844 (2d Cir.1990). To achieve this purpose, a warrant need not describe the items to be seized in such detail as to eliminate the executing officer's discretion completely. *See id.* at 844–45; *accord United States v. Levy,* 2013 WL 664712, at *5 (S.D.N.Y. Feb. 25, 2013) ("The Fourth Amendment does not require that every item or document to be seized be specifically identified in the warrant."). Rather, a warrant's description of the items to be seized need only be "sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize." *United States v. Liu,* 239 F.3d 138, 140 (2d Cir. 2000) (internal quotation marks and alterations omitted).

██ The Warrants at issue here meet that standard. Although each Warrant broadly describes the items to be seized as "evidence, fruits, or instrumentalities" of specified federal crimes, each also sets forth an illustrative list of items to be seized. The inclusion of an illustrative list of seizable items brings the Warrants within the Fourth Amendment's particularity parameters. *See United States v. Riley,* 906 F.2d at 844–45 (description of seizable items is sufficiently particular if "delineated in part by an illustrative list"); *United States v. Jacobson,* 4 F.Supp.3d 515, 524 (E.D.N.Y.2014) ("The reference to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants."); *United*

*States v. D'Amico*, 734 F.Supp.2d 321, 363 (S.D.N.Y.2010) ("Attachment A provides an exemplary list of records and other items falling within the scope of the Warrant, thereby enabling the executing agents to identify with reasonable certainty what they were authorized to seize.").

Lustyik and Thaler contend each Warrant's illustrative list of items to be seized does not, in fact, restrict an executing officer's discretion at all, because the lists are modified by the phrase "including, without limitation." (Lustyik Mem. at 12–13; Thaler Mem. at 24–25). Thus, the argument goes, the Warrants in essence permit the seizure of all evidence of the specified crimes, which violates the particularity requirement. *See United States v. Buck*, 813 F.2d 588, 590–92 (2d Cir.1987) (invalidating warrant authorizing seizure of "any papers, things or property of any kind relating to [the] previously described crime").

Second Circuit case law says otherwise. In *Riley*, the Circuit upheld a warrant calling for the seizure of "records of the distribution of cocaine ... *including but not limited to*, bank records, brokerage house records, business records, [and] safety deposit box keys or records." 906 F.2d at 843 (emphasis added). District courts in this Circuit likewise have approved warrants providing an illustrative, but not exhaustive, list of items to be seized. *See United States v. Jacobson*, 4 F.Supp.3d at 519 (upholding warrant for "[a]ny and all records, data and correspondence constituting evidence, fruits and instrumentalities of" specified federal crimes, "in any form wherever that they may be stored or found including, but not limited to" enumerated categories of items); *United States v. D'Amico*, 734 F.Supp.2d at 358 (upholding warrant for "[a]ll records relating to communications, including but not limited to telephones, pagers, [and] cellular telephones"). As explained above, a warrant need not set out every single item to be seized. *See United States v. Riley*, 906 F.2d at 844–45; *United States v. Levy*, 2013 WL 664712, at *5. It is enough if the warrant "permit[s] the rational exercise of judgment by the executing officers in selecting what items to seize." *United States v. Liu*, 239 F.3d 138, 140 (2d Cir.2000) (internal quotation marks and alterations omitted). A list providing examples of the items to be seized, albeit a list modified by the phrase "including, but not limited to," offers sufficient guidance to law enforcement officers to pass constitutional muster.

Accordingly, the Warrants satisfy the Fourth Amendment's particularity requirement.

**B. *Overbreadth***

 "Although somewhat similar in focus," particularity and overbreadth "are two distinct legal issues." *United States v. Zemlyansky*, 945 F.Supp.2d 438, 450 (S.D.N.Y.2013) (internal quotation marks omitted). While the particularity analysis concerns whether the warrant "enable[s] the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize," *United States v. George*, 975 F.2d 72, 75 (2d Cir.1992), the overbreadth inquiry asks "whether the warrant authorized the search and seizure of items as to which there is no probable cause." *United States v. Dupree*, 781 F.Supp.2d 115, 148 n. 14 (E.D.N.Y.2011) (internal quotation marks omitted). Thus, a warrant is overbroad if its "description of the objects to be seized ... is broader than can be justified by the probable cause upon which the warrant is based." *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir.2013) (internal quotation marks omitted).

■ Thaler contends the June 2012 Thaler Warrant is overbroad because its illustrative list of items to be seized "exceeded that which could be linked to a § 1503(a) violation." (Thaler Mem. at 15). But the categories of items to be seized must be read together with the preceding text, *see United States v. Riley*, 906 F.2d 841, 844 (2d Cir.1990) ("In upholding broadly worded categories of items available for seizure, we have noted that the language of a warrant is to be construed in light of an illustrative list of seizable items."), which authorizes the government to seize only "evidence, fruits, or instrumentalities" of a Section 1503 violation. (GX 10). Thus, the June 2012 Thaler Warrant does not permit the seizure and retention of, for example, *all* communications between or among Lustyik, Thaler, and Taylor; rather, the government may seize only those communications between or among those men that there is probable cause to believe are evidence of a Section 1503 violation. As explained above, there was probable cause to believe emails between or among Lustyik, Thaler, and Taylor would contain evidence of Lustyik's efforts to obstruct the Utah investigation. The June 2012 Thaler Warrant then, read as a whole, is not overbroad.[11]

## IV. Search of Lustyik's and Thaler's Email Accounts and Smart Phones

■ Lustyik and Thaler contend the government engaged in unconstitutional "general rummaging" by reviewing the entire contents of their email accounts and smartphones without the guidance of search protocols.

The Second Circuit has "not required specific search protocols or minimization undertakings as basic predicates for upholding digital search warrants." *United States v. Galpin*, 720 F.3d at 451. Thus, even assuming the Fourth Amendment requires such protocols—a matter about which courts have disagreed, *see In re a Warrant for All Content and Other Information Associated with the Email Account xxxxxxxx@gmail.com Maintained at Premises Controlled By Google, Inc.*, 33 F.Supp.3d 386, 388, 396–97, 2014 WL 3583529, at *1, *8 (S.D.N.Y. July 18, 2014)—in the absence of controlling precedent requiring search protocols, it cannot be said the agents acted in bad faith. *See United States v. Clark*, 638 F.3d 89, 105 (2d Cir.2011) (exclusionary rule does not apply "where the need for specificity in a warrant ... was not yet settled or was otherwise ambiguous"); *United States v. Buck*, 813 F.2d 588, 593 (2d Cir.1987) (when "the law [is] unsettled" as to warrant requirements, "a reasonably well-trained police officer could not be expected to know that the warrant ... violated the Fourth Amendment").

Accordingly, the government did not violate the Fourth Amendment by reviewing the contents of Lustyik's and Thaler's email accounts and smartphones without search protocols.[12]

11. Even assuming the June 2012 Thaler Warrant is facially overbroad, the good faith exception to the exclusionary rule applies. Agent Hopkins credibly testified the government's reviewers were "guided by" Section III of Attachment B when reviewing the emails seized pursuant to the June 2012 Thaler Warrant, and he agreed the illustrative list of items to be seized "relate[d] back" to the specified crime or crimes. (*See* Tr. 268–69). Thus, in practice, the government searched only for emails "relating to those alleged violations." (*Id.*).

12. Although it is true, under existing precedent, the Fourth Amendment does not require search warrants to specify "the precise manner in which they are to be executed," *United States v. Grubbs*, 547 U.S. 90, 98, 126 S.Ct. 1494, 164 L.Ed.2d 195 (2006), the Court recognizes that settled Fourth Amendment precedent may apply differently—or not at all—in

### V. *Suppression of the Re–Coded Emails*

Thaler also moves to suppress the Re–Coded Emails. Relying on *United States v. Ganias*, 755 F.3d 125 (2d Cir.2014), Thaler argues the government's review of his emails months after they were initially marked as "not relevant" or "not sure" amounted to a "general rummaging."

 Like all activities governed by the Fourth Amendment, the execution of a search warrant must be reasonable. *United States v. Ramirez*, 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998). Law enforcement officers therefore must execute a search warrant within a reasonable time. *See United States v. Ganias*, 755 F.3d at 136; *United States v. Metter*, 860 F.Supp.2d 205, 215 (E.D.N.Y.2012). And officers may not seize and retain items outside the scope of a warrant. *See United States v. Matias*, 836 F.2d 744, 747 (2d Cir.1988).

 "[W]hen items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items." *United States v. Matias*, 836 F.2d at 747. "[T]he retention of items outside the scope of the warrant can be justified only if the Government meets its burden of demonstrating that those items fall within an exception to the warrant requirement," such as the plain view exception. *Doane v. United States*, 2009 WL 1619642, at *10–11 (S.D.N.Y. June 5, 2009); *see also United States v. Ganias*, 755 F.3d at 137 (government may not retain documents outside scope of search warrant "[w]ithout some independent basis for its retention of those documents"); *United States v. Galpin*, 720 F.3d 436, 448 (2d Cir.2013) (when evidence seized from computer files pursuant to a defective warrant, one of the "proper next steps" is to determine "whether the challenged evidence was in plain view when it was seized").

Thus, in determining whether the Re–Coded Emails must be suppressed, the first question is whether those emails fall within the scope of one of the Thaler Email Warrants. If so, the only other question is whether the emails were re-coded within a reasonable time. If, however, the Re–Coded Emails exceed the scope of the Thaler Email Warrants, then the emails must be suppressed unless they fall within an exception to the warrant requirement.

As explained below, the Re–Coded Emails fall outside the respective scope of

---

the context of digital searches. *See United States v. Galpin*, 720 F.3d at 446 ("Searches of computers ... often involve a degree of intrusiveness much greater in quantity, if not different in kind, from searches of other containers." (internal quotation marks omitted)). The Supreme Court's recent decision in *Riley v. California*, — U.S. ——, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014), exemplifies this point. There, the Court considered whether law enforcement officers must obtain a warrant before searching the contents of a cell phone seized incident to arrest. *Id.* at 2480. Since 1973, officers had been able to search, without a warrant, the contents of any physical object found on a person during a search incident to arrest. *Id.* at 2484–85, 2488–89 (discussing *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973)). But in *Riley*, the Court declined to extend the search-incident-to-arrest exception to cell phones, explaining that cell phones "differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person" because of their "immense storage capacity" and "pervasiveness" in society. *Id.* at 2489–90. Accordingly, while today search protocols are not essential elements of warrant applications for digital evidence, the Court appreciates the threats to privacy posed by digital searches, *see United States v. Galpin*, 720 F.3d at 447 (noting the "serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant"), and understands that such threats may eventually make digital search protocols a Fourth Amendment necessity.

each Thaler Email Warrant; however, because the government lawfully seized and retained those emails under the plain view exception, the emails need not be suppressed.

### A. *The Re–Coded Emails Exceed the Scope of the Thaler Email Warrants*

As noted above, the June 2012 Thaler Warrant authorized the government to seize only "[e]vidence, fruits, or instrumentalities" of Lustyik's efforts to obstruct the investigation into Taylor, in violation of Section 1503. (GX 10). And although the September 2012 Thaler Warrant permitted the government to seize, in addition to evidence of obstruction of justice, "[e]vidence, fruits, or instrumentalities" of a Section 208 violation and honest services fraud, the probable cause justifying the government's seizure of such materials was similarly grounded in Lustyik's alleged obstruction and attempted use of Taylor as a confidential FBI source. (*See* September 2012 Hopkins Aff. ¶¶ 5, 12; Tr. 320–22, 333).

Taylor, however, had nothing to do with the scheme to sell information to Ahmed discussed in the Re–Coded Emails. Agent Hopkins admitted as much at the August 26, 2014, suppression hearing, conceding he "ultimately determine[d] that Michael Taylor was [not] involved" in the Ahmed bribery scheme. (Tr. 255). The government, too, acknowledged at the hearing that the Ahmed bribery scheme "morphed" and "went away from what was originally conceived as the use of Taylor's source to sell that information to Ahmed," as discussed in the October 25, 2011, Emails, "into just the direct sale of documents … just selling straight up the documents." (*Id.* at 393).

Thus, because Taylor was not, in fact, involved in the scheme discussed in the

Re–Coded Emails, it cannot be said those emails constitute "[e]vidence, fruits, or instrumentalities" of Lustyik's efforts to obstruct the investigation into Taylor or use Taylor as a confidential source.

### B. *Plain View*

Although the Re–Coded Emails fall outside the scope of the Thaler Email Warrants, the emails nevertheless were lawfully seized and retained under the plain view exception.

"The plain view exception authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." *United States v. Gamble*, 388 F.3d 74, 76 (2d Cir.2004) (internal quotation marks omitted).

"Probable cause exists to believe that a certain item is evidence of a crime if 'the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be … useful as evidence of a crime.'" *United States v. Juliano*, 2000 WL 1206745, at *3 (S.D.N.Y. Aug. 24, 2000) (quoting *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion)). The belief that an item is evidence of a crime need not "be correct or more likely true than false. A practical, nontechnical probability that incriminating evidence is involved is all that is required." *Texas v. Brown*, 460 U.S. at 742, 103 S.Ct. 1535 (internal quotation marks omitted).

Probable cause is measured "at the time of seizure," not at the time the item is first observed. *See Texas v. Brown*, 460 U.S. at 749, 103 S.Ct. 1535 (Stevens, J., concurring); *accord United States v. Barrios–Moriera*, 872 F.2d 12, 16 (2d Cir.1989) ("[I]t must have been imme-

diately apparent to the officer before seizing the item ... that it was of a criminal character." (internal quotation marks omitted)); *United States v. Johnston,* 784 F.2d 416, 420 (1st Cir.1986) (rejecting argument that probable cause is determined when officer "first viewed the items"). But law enforcement officers may not "conduct[ ] some further search" of the item to develop probable cause between the time they first view the item and the time of seizure. *Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

■ Here, the government's team of reviewers had lawful access to the Re–Coded Emails because those emails had been obtained pursuant to a valid warrant, and, at the time the emails were re-coded, the government had not taken an unreasonably long time to conduct its review. Indeed, the government had held the emails for approximately three months, while "[n]umerous cases" have found reasonable "delay[s] of several months between the seizure of electronic evidence and the completion of the government's review." *United States v. Metter,* 860 F.Supp.2d 205, 215 (E.D.N.Y.2012) (emphasis omitted).

■ The government also had probable cause to believe the Re–Coded Emails, at the time they were seized, were evidence of a crime. For plain view purposes, the Re–Coded Emails were "seized" when they were marked as "relevant." *See In re the Search of Information Associated [Redacted]@mac.com that is Stored at Premises Controlled by Apple, Inc.,* 13 F.Supp.3d 145, 152–53 (D.D.C.2014), *vacated on other grounds* 13 F.Supp.3d 157 (D.D.C.2014) (seizure "occurs after [the government] has searched and separated the relevant e-mails from the irrelevant ones" (emphasis omitted)).[13] At that time, the government had reviewed text messages "explicitly discussing the sale of U.S. government information and documents by Special Agent Lustyik through Mr. Thaler to Mr. Ahmed concerning Sajeeb Wazed Joy" (Tr. 256–57), as well as the October 25, 2011, Email Chain, in which Lustyik described his "master plan" to "use info from Taylor's source within the current Bang govt. and sell it to ceaser's people." (GX 14).

The government certainly had probable cause to believe the text messages and the October 25, 2011, Email Chain constituted evidence of a crime, either bribery (as the government thought) or, in the case of the October 25, 2011, Email Chain, obstruction of justice, as the "fortune" Lustyik hoped to make selling information from Taylor's source would provide him with an "improper motive" to obstruct the investigation into Taylor. *United States v. Quattrone,* 441 F.3d 153, 173 (2d Cir.2006). The Re–Coded emails appear to relate to the schemes described in both the text messages and the October 25, 2011, Email chain. In that regard, the Re–Coded Emails include emails from Ahmed providing Thaler with information about Joy, as well as emails discussing payments from Ahmed to Lustyik for information.

And the government did not "conduct[ ] some further search" of the Re–Coded Emails *Minnesota v. Dickerson,* 508 U.S. at 375, 113 S.Ct. 2130, by reviewing them again after initially marking them as "not sure" or "not relevant." *See United States v. Knoll,* 16 F.3d 1313, 1319 (2d Cir.1994) (no "search" occurred when agents read

---

**13.** To be sure, a "seizure" also occurred when Thaler's email service provider copied the contents of his email account and provided that copy to the government. *See id.;* *United States v. Ganias,* 755 F.3d at 141. But in the plain view context, the relevant "seizure" is the one that occurs *after* law enforcement officers observe the seized item.

documents that had already been read by others).

Thus, given the facts known to the government at the time the Re–Coded Emails were marked as "relevant," a person "of reasonable caution" would have believed those emails constituted evidence of a crime. *United States v. Juliano*, 2000 WL 1206745, at *3 (quoting *Texas v. Brown*, 460 U.S. at 742, 103 S.Ct. 1535).

*United States v. Ganias* is readily distinguishable. There, the government obtained a warrant to search the defendant's offices for materials relating to two companies for which he had performed accounting work. 755 F.3d 125, 128 (2d Cir.2014). The government seized the defendant's personal financial records, which were plainly outside the scope of the warrant, and retained those records for two-and-a-half years before developing probable cause to believe they contained evidence that he had committed tax evasion. *Id.* at 128–29. The Second Circuit held the government violated the defendant's Fourth Amendment rights by retaining the records "for an unreasonable amount of time." *Id.* at 137. Importantly, the Circuit did not address whether the seizure and retention of the defendant's personal financial records was justified under an exception to the warrant requirement. *Id.* at 133 n. 7.

Here, by contrast, the government had the Re–Coded Emails for only three months before re-reviewing them. And the Court has determined the plain view exception to the warrant requirement renders the government's retention of the Re–Coded Emails lawful.

Accordingly, Thaler's motion to suppress the Re–Coded Emails is denied.[14]

### VI. *Thaler's Statements to the OIG Agents*

Thaler's only asserted basis for moving to suppress his statements to the OIG agents is that such statements are fruit of the poisonous tree because they were made "in conjunction with and attendant to" the search of his residence, and the warrant for his residence was based on evidence unlawfully obtained pursuant to the Thaler Email Warrants. (Thaler Mem. at 28–29).

The Court, however, has determined the government did not improperly seize any evidence pursuant to the Thaler Email Warrants. If there is no poisonous tree, then there is no fruit to suppress. *United States v. Knoll*, 16 F.3d at 1322.

Accordingly, Thaler's motion to suppress his statements is denied.

### CONCLUSION

Lustyik's and Thaler's motions to suppress (Docs. ## 74, 77) are DENIED.

The Clerk is instructed to terminate the motions.

SO ORDERED.

---

**14.** Even if the Re–Coded Emails did not meet the plain view exception's requirements, they nevertheless would be admissible against Lustyik and Ahmed, as neither has an expectation of privacy in Thaler's email account. *United States v. Nazemzadeh*, 2013 WL 544054, at *2 n. 2 (S.D.Cal. Feb. 12, 2013).